733 F.2d 1226
 5 Soc.Sec.Rep.Ser. 160, Medicare&Medicaid Gu 33,966
WISCONSIN HOSPITAL ASSOCIATION, a Wisconsin not-for-profit
corporation, et al., Plaintiffs-Appellees,
v.
Linda REIVITZ, Secretary, Wisconsin Department of Health &
Social Services, & Charles P. Smith, Treasurer,
State of Wisconsin, Defendants-Appellants.
 No. 83-1725.
 United States Court of Appeals,
Seventh Circuit.
 Argued Dec. 2, 1983.
Decided May 8, 1984.
 
 Gerald S. Wilcox, Wisconsin Dept. of Justice, Madison, Wis., for defendants-appellants.
 Jon P. Axelrod, DeWitt, Sundby, Huggett & Schumacher, Madison, Wis., for plaintiffs-appellees.
 Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and MAROVITZ, Senior District Judge.*
 CUDAHY, Circuit Judge.
 
 
 1
 Plaintiffs, including the Wisconsin Hospital Association ("WHA") and several individual Wisconsin acute general care hospitals, challenged the constitutionality of a Wisconsin statute which continued Medicaid reimbursement rates at their 1982 level for the first three months of the medical assistance providers' 1983 fiscal year. The district court, granting summary judgment for the plaintiffs, held that this Wisconsin statute was unconstitutional under the Supremacy Clause because it conflicted with a federal statute and because a rate freeze is inherently unreasonable. We reverse and remand for further proceedings.
 
 
 2
 * The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. Sec. 1396 et seq., provides reimbursement by the federal government of a portion of the payments made by participating states to hospitals and other entities furnishing medical care to the indigent. While participation in the program is voluntary, once a state elects to participate, it must comply with federal statutory requirements. Harris v. McRae, 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). Each participating state administers the program pursuant to a state plan that must be approved by the United States Department of Health and Human Services ("HHS"). Wisconsin has elected to participate in the Medicaid program and has entered into such a state plan with HHS for Medicaid Assistance.
 
 
 3
 Prior to October 1, 1981, hospital Medicaid reimbursement was based upon a "reasonable cost" standard found in what was then 42 U.S.C. Sec. 1396a(a)(13)(D) (1976) which provided
 
 
 4
 for payment of the reasonable cost of inpatient hospital services provided under the plan, as determined in accordance with methods and standards, consistent with section 1320a-1 of this title, which shall be developed by the state and reviewed and approved by the Secretary and (after notice of approval by the Secretary) included in the plan....
 
 
 5
 In 1980, Congress enacted the "Boren Amendment" which changed the federal standard for reimbursement rates for nursing and intermediate care facilities and also provided for both more stringent cost containment and less federal oversight of state reimbursement methodologies. In 1981, Congress expanded this new standard to apply to hospital reimbursement rates as well in the Omnibus Budget Reconciliation Act ("OBRA"). The relevant statutory provision, as modified by the Boren Amendment and OBRA, requires in pertinent part that a state plan for medical reimbursement must provide
 
 
 6
 for payment ... of the hospital, skilled nursing facility, and intermediate care facility services provided under the plan through the use of rates ... which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards ....
 
 
 7
 42 U.S.C. Sec. 1396a(a)(13)(A) (Supp. V 1981). The shift from reimbursement of all reasonable costs to reimbursement of those "reasonable and adequate ... costs which must be incurred by efficiently and economically operated facilities" represented a significant change in the federal standard. This change permitted states to alter their plans with the purpose of encouraging cost containment in the medical and health-related fields and allowing the states to cope with reductions in the amount of funds to be paid by the federal government to the states under the Medicaid program. 42 U.S.C. Sec. 1396b(s)(1)(A) and Sec. 1396b(t) (Supp. V 1981).
 
 
 8
 The Wisconsin state plan provides that hospitals receive interim payments at an "Interim Inpatient Rate Per Discharge," established at the beginning of each hospital's fiscal year. "Final Settlement" is made at the end of the hospital's fiscal year based on a "Per Discharge Rate," with the interim payments counting as a credit against the final payment due. The final settlement rate is determined retrospectively by cumulatively applying a hospital cost index, calculated on the basis of actual costs for the past fiscal year, to hospital rates established for a base year. In accordance with 42 U.S.C. Sec. 1396a(a)(13)(A), Wisconsin made assurances to HHS that the rate increases based on this rate-setting method were "reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers ... in conformity with applicable State and Federal laws ...." These assurances also described the rate increases as "based on inflationary increases for a federally-defined hospital market basket." These latest assurances were submitted to HHS on June 25, 1982, and approved on July 19, 1982.
 
 
 9
 On April 30, 1982, the Wisconsin legislature enacted the Wisconsin Budget Reconciliation Act, Chapter 317, Laws of 1981, which provided in part for a delay in increases in Medicaid rates for three months beginning July 1, 1982:
 
 
 10
 Notwithstanding any other law, nursing home reimbursement rates established for 1982 shall remain in effect to March 31, 1983, and reimbursement rate increases to other providers of medical assistance that are scheduled to take effect on or after July 1, 1982 and before July 1, 1983 are delayed for 3 months after the date that they would otherwise take effect.
 
 
 11
 Ch. 317, Sec. 2033(5).[1] Rate increases were therefore calculated on the basis of the same hospital cost index but were simply delayed for three months, thus keeping reimbursement rates at the 1982 rates for the initial three months. Providers were informed of the rate increase and the delay in the increases at the same time.
 
 
 12
 The plaintiffs in this suit are the Wisconsin Hospital Association, a Wisconsin not-for-profit corporation representing 142 acute general care Wisconsin hospitals, and three individual acute general care hospitals in Wisconsin. All the plaintiff-hospitals and all members of WHA have entered into "Provider Agreements" with the Wisconsin Department of Health and Social Services ("WDHSS") whereby WDHSS has agreed to reimburse them for services to Medicaid patients according to the terms of the state plan.
 
 
 13
 These plaintiffs have challenged the Wisconsin Medicaid reimbursement plans twice before. In Wisconsin Hospital Association v. Schmidt, [1976 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) p 27,818 (E.D.Wis. April 28, 1976) ("WHA I" ), the district court found that a state order freezing Medicaid reimbursement rates, apparently for an indefinite period, which the acting Regional Director of the Department of Health, Education and Welfare considered to be an unacceptable deviation from the Wisconsin plan, was in conflict with federal law requiring reasonable reimbursement.
 
 
 14
 In Wisconsin Hospital Association v. State of Wisconsin, Department of Health and Social Services, No. 80-C-1012 (E.D.Wis. July 21, 1982) ("WHA II "), WHA again challenged the state plan on the ground that it failed to provide reasonable reimbursement to Medicaid providers. This suit was settled by an Amended Stipulation adopted by the district court in an order signed July 21, 1982. This Stipulation required that the plaintiffs be reimbursed in accordance with the state plan as appended to the Stipulation. This state plan evidently incorporates the anticipated rate increases for the 1983 fiscal year but makes no mention of the postponement of the increase which had already been approved by the Wisconsin legislature. The plaintiffs and the defendants each cite this Stipulation to support their respective positions. The plaintiffs argue that the Wisconsin Omnibus Budget Reconciliation Act, Chapter 317, Sec. 2033(5), violates the district court order entering the Stipulation. The defendant argues that the Stipulation, in referring to applicable state and federal law, incorporates the delay of the increase and that the plaintiffs are estopped to challenge the statute's validity because they waived their right to challenge it by signing the Stipulation after they were aware of the statute's provisions.
 
 
 15
 In addition to their claim that the "freeze"[2] violates the district court's order, the plaintiffs also asserted in the district court that the freeze is unconstitutional because it violates the Supremacy Clause, impermissibly impairs the obligations of contract, takes property without due process of law and violates the equal protection clause. The plaintiffs' primary argument was that the freeze is by its nature arbitrary and therefore in conflict with the requirement in 42 U.S.C. Sec. 1396a(a)(13)(A) that reimbursement rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities ...." Plaintiffs also challenged the freeze because the state had not submitted any assurances to HHS which reflected the effects of the freeze. The state of Wisconsin relied primarily on its incorporation and waiver arguments. The state also contended that the plaintiffs bear the burden of showing that the hospitals represented are "efficiently and economically operated" before they can challenge the reasonableness of the reimbursement rates.
 
 
 16
 The district court held that the statute imposing the three-month freeze was unconstitutional because it violated the Supremacy Clause by conflicting with 42 U.S.C. Sec. 1396a(a)(13)(A). Wisconsin Hospital Association v. Reivitz, [1983 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) p 32,380 (E.D.Wis. Jan. 11, 1983) ("WHA III "). The basis for this conclusion was that once the state had assured HHS that its plan provided a reasonable and adequate reimbursement rate based on inflationary increases, any subsequent plan which then provided for a lower reimbursement rate must be unreasonable and inadequate. The district court also relied on its holding in WHA I that a rate freeze is inherently unreasonable. The district court rejected the state's assertion that the Stipulation incorporated the freeze because an unconstitutional law would not have been considered "applicable." Finally, the court rejected the state's waiver argument because it found that, even though all parties in fact knew of the freeze before the Stipulation was finally signed, the Stipulation had reached its final form by February 24, 1982, before the freeze was proposed in the Wisconsin legislature. Only a dispute concerning the effective date of the settlement plan delayed final execution of the Stipulation; the plaintiffs therefore were not estopped to question the validity of the freeze. The district court did not reach the other grounds on which the plaintiffs had challenged the constitutionality of the statutory provision in question.
 
 II
 
 17
 Enactment of the Boren Amendment in 1980 and OBRA in 1981, in combination with various federal and state attempts to contain spiralling medical costs and to meet other budgetary requirements, resulted in the modification and subsequent litigation of several state reimbursement plans under the Medicaid program. After examining the court decisions arising from this litigation and the policies underlying them, we conclude that the Wisconsin statute delaying Medicaid reimbursement rate increases is not inherently unreasonable. A brief review of some of these other decisions will help in presenting this analysis.
 
 
 18
 The state of Mississippi revised its hospital reimbursement rate structure in 1981 to allow reimbursement of operating costs only up to a ceiling established by the actual costs of those hospitals falling into the lower-cost 80% of hospitals ranked by cost performance on a comparable basis for the preceding year. Both the district and circuit courts found that this plan met the "reasonable and adequate" standard even though the state's primary motive in developing the plan was cost containment. Mississippi Hospital Association, Inc. v. Heckler, 701 F.2d 511 (5th Cir.1983).
 
 
 19
 In Coalition of Michigan Nursing Homes, Inc. v. Dempsey, 537 F.Supp. 451 (E.D.Mich.1982), the court refused to enjoin modification of the state plan which reduced the maximum profit factor allowed to long-term care facilities, even though under pressure of budgetary deadlines the state had failed to follow full rulemaking procedures.[3] Again, the court concluded that the reimbursement methodology provided "reasonable and adequate" rates and that, under the revised federal standard, states should be permitted to set their rates "without stifling and expensive federal oversight of the methodology used, as had been the case under the former reasonable cost related standard ...." Id. at 459.
 
 
 20
 A district court also denied a preliminary injunction in Hillhaven Corp. v. Minnesota Department of Public Welfare, No. 3-83-75 (D.Minn. May 4, 1983), when the plaintiffs failed to establish the likelihood that a 4% reduction in reimbursement rates to nursing home medical assistance providers from January 1, 1983 to June 30, 1983 would violate the federal "reasonable and adequate" standard. Also recognizing the changes in the applicable federal standard, the Eleventh Circuit held that an amended plan which had been properly approved under the prior "reasonable cost" standard would satisfy the new "efficient cost" standard. Alabama Hospital Association v. Beasley, 702 F.2d 955, 958 (11th Cir.1983).
 
 
 21
 Congress, in replacing the reasonable cost standard with one based on considerations of efficiency and economy, intended to give the states flexibility to lower reimbursement levels below those required by the reasonable cost standard.... [T]he new "efficient cost" standard is designed to lower the threshold of permissible reimbursement rates ....
 
 
 22
 Id. at 958. The court also emphasized the OBRA legislative history which reiterates that the old standard was "inherently inflationary and contain[ed] no incentives for efficient performance." S.Rep. No. 139, 97th Cong., 1st Sess., 478, reprinted in 1981 U.S. CODE CONG. & AD.NEWS 396, 744.
 
 
 23
 In California, on the other hand, a district court enjoined implementation of a 6% cap on increases for reimbursement rates for the 1982 fiscal year over the rates for the 1981 fiscal year. California Hospital Association v. Schweiker, 559 F.Supp. 110 (C.D.Cal.1982), aff'd mem., 705 F.2d 466 (9th Cir.1983). The district court, without analysis, concluded that the 6% cap was arbitrary and capricious because the state had failed to make sufficient findings that the new rates were reasonable and adequate to meet the costs of efficiently and economically operated hospitals and because the state had failed to submit an assurance to HHS or to receive its approval. See also Thomas v. Johnston, 557 F.Supp. 879, 904-05 (W.D.Tex.1983) (state plan amendment establishing uniform reimbursement rates for specialized care in schools and homes for the mentally retarded did not meet federal "reasonable and adequate" reimbursement standards).
 
 
 24
 In United Hospital Center, Inc. v. West Virginia Department of Health, No. 83-84-C (N.D.W.Va. Dec. 30, 1983), the district court held that modifications of the West Virginia Medicare and Medicaid plans were unconstitutional because in conflict with the federal statute. While the court analyzed several complex provisions, the most relevant provisions involved changes in the Medicaid plan. The modifications imposed a freeze, apparently for an unlimited time, on hospital rates, including reimbursement rates under both Medicaid and Medicare. The district court held that a freeze is a significant change in repayment methodology for Medicaid and that the state's failure to submit the proposed regulation to HHS rendered it unconstitutional. In addition, the amendments would have set up a second-tier regulatory agency, in conflict with the federally-mandated single state agency concept, and would have required hospitals to repay gross revenue in excess of a prescribed limit to the state agency. Because of complex accounting methods, it was possible that a hospital might have had to pay funds to the agency which it had never actually received. The district court thus found numerous conflicts in the proposed plans with the federal statute, but the last-mentioned payment feature was singled out as "[p]erhaps the most troublesome aspect," slip op. at 12. The West Virginia proposed modifications would have had a significantly greater effect on the state's Medicaid and Medicare plans than the Wisconsin freeze, with its limited duration, would have had on that state's reimbursement methodology.
 
 
 25
 Finally, two recent decisions in the Northern District of Illinois have reached conflicting conclusions concerning similar attempts to modify the Illinois reimbursement rate structure. In Illinois Council on Long Term Care v. Miller, [1983 Transfer Binder] MEDICARE & MEDICAID GUIDE (CCH) p 33,083 (N.D.Ill. Sept. 7, 1983), the district court refused to enjoin implementation of Illinois Public Act 83-17 which delayed all rate increases for one year from July 1, 1983 to July 1, 1984. Previously, the plan had provided for cost of living increases in reimbursement rate levels. After passage of the Act on July 1, 1983, the state submitted the plan amendment with proper assurances and information to HHS on July 14. At the time of the district court decision, HHS had not yet acted on the amendment.
 
 
 26
 The plaintiff, representing several member nursing homes, alleged that the proposed amendment could not be put into effect until it had been approved by HHS and that the amendment violated the federal statute because it was based on purely budgetary considerations, violated the Contract Clause and deprived the member facilities of property interests created directly by their contracts with the state and indirectly by the contract between the state and the federal government. The district court decided not to determine whether the plan amendments met federal standards but rather to await the determination of HHS as to the plan's reasonableness and adequacy under the doctrine of primary jurisdiction. However, the court also held that the state of Illinois could implement the plan amendment pending acceptance by HHS of the amendment. See also Magee-Womens Hospital v. Heckler, 562 F.Supp. 483, 486 (W.D.Pa.1983) (approval of HHS not required before state can enforce amendment to Medicaid program). Finally, the district court held that budgetary considerations were not an impermissible motive as long as the plan did not violate federal standards and that the nursing homes' only contractual right was the right to reimbursement in accordance with federal standards.
 
 
 27
 In Illinois Hospital Association v. Illinois Department of Public Aid, 576 F.Supp. 360 (N.D.Ill.1983), on the other hand, the district court considered a plan amendment which assured hospitals of reimbursement for fiscal year 1984 at a rate which is approximately 22% less than the actual funding of services in fiscal year 1983.[4] Although the Illinois Department of Public Aid promised to seek additional funds in order to recalculate reimbursement rates at the end of the fiscal year, it would be under no actual obligation under the plan to do so. The district court emphasized the uncertainties engendered by such a plan in that the hospitals were assured of neither the date nor actual amount of final payment. Having concluded that the plaintiffs had a reasonable likelihood of success in establishing that the Illinois hospital reimbursement rates were arbitrary and unreasonable and thus in violation of section 1396a(a)(13)(A) and 1396a(a)(30), the district court granted a preliminary injunction.
 
 III
 
 28
 The central and, in fact, only issue in the present case is whether the Wisconsin freeze in reimbursement rate increases is unconstitutional because it fails to comport with federal requirements. All of the claims raised by the plaintiffs depend exclusively on this determination. The district court resolved this issue by relying almost entirely on its earlier holding in WHA I and concluded that a rate freeze of any sort is per se unreasonable. In so doing, the district court failed to examine adequately the reasonableness of this particular plan amendment and its compliance or noncompliance with federal standards.
 
 
 29
 The federal standard requires that the reimbursement plan be "reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities." 42 U.S.C. Sec. 1396a(a)(13)(A). The state had previously made assurances to HHS that its prior plan provided for "reasonable and adequate" reimbursement rates. The plaintiffs therefore argued, and the district court agreed, that reimbursements at any lower rate must be unreasonable or inadequate.
 
 
 30
 In making these assurances, however, the state is merely adopting the statutory formula and saying that, at the least, its plan conforms to federal requirements; the state does not certify that these rates are only or barely adequate. It is not therefore for a court to conclude, without further analysis and consideration of evidence, that any other rate is by definition unreasonable or inadequate.
 
 
 31
 In general, rates required to meet a standard of reasonableness may fall within a zone of reasonableness, and the establishment of one rate as "reasonable" does not necessarily render every other rate "unreasonable." In Federal Power Commission v. Conway Corp., 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed.2d 626 (1976), the Supreme Court, although in another context, spoke clearly in support of the zone of reasonableness doctrine:
 
 
 32
 This argument [that the determination of a just and reasonable rate is conclusive] assumes ... that ratemaking is an exact science and that there is only one level at which a ... rate can be said to be just and reasonable and that any attempt to remedy a discrimination by lowering the [federally regulated] rate would always result in an unjustly low rate that would fail to recover fully allocated ... costs. As the Court of Appeals pointed out and as this Court has held, however, there is no single cost-recovering rate, but a zone of reasonableness: "Statutory reasonableness is an abstract quality represented by an area rather than a pinpoint. It allows a substantial spread between what is unreasonable because too low and what is unreasonable because too high."
 
 
 33
 426 U.S. at 278, 96 S.Ct. at 2004 (quoting Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 251, 71 S.Ct. 692, 695, 95 L.Ed. 912 (1951)). Further, at least in the context of ratemaking by federal agencies, a reviewing court is "without authority to set aside any rate ... which is within a 'zone of reasonableness.' " Permian Basin Area Rate Cases, 390 U.S. 747, 767, 88 S.Ct. 1344, 1360, 20 L.Ed.2d 312 (1968) (quoting Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037 (1942)). See also Federal Power Commission v. Hope Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944) ("if the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the [Natural Gas] Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important."). Although we can express no opinion on the reasonableness of the reimbursement rate increases as affected by the freeze without a more complete record than the one before us, we think it entirely possible that the rate increases and the resulting rates, as modified by the limited freeze, may, under all the circumstances, fall within a zone of reasonableness and adequacy.
 
 
 34
 The district court also held that a rate freeze is inherently unreasonable because it is arbitrary in ignoring inflationary increases. In relying on its decision in WHA I, the district court did not give much weight to the changes in the statutory language and to the differences in the factual situation between the two cases. As noted, the Boren Amendment changed the federal standard from reimbursement for "reasonable cost" to reimbursement which is "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." This change illustrates Congress' concern with cost containment in addition to simple reimbursement. Congress apparently recognized, inter alia, that simple cost-plus adjustments would do little to discourage inflation in the health care economy.
 
 
 35
 Finally, the freeze at issue in WHA I was for an indeterminate period of time. Payments to providers of medical services could have been kept at the same rate level indefinitely and, as the defendants in this case concede, that was clearly an untenable state of affairs. In the present case, however, the freeze or delay was for a clearly defined period of time of only three months. The new rate increases which were to take effect in the second quarter were already known to the providers and so they could rely on both the timing and the amounts of the future rate increases.
 
 
 36
 Because the reviewing court is required to examine the individual effects of this particular rate freeze in order to determine whether the resulting rates are adequate and reasonable, it is necessary to remand for additional consideration of this issue. The record in this case lacks the technical data required to make the necessary determination. For example, data in the record show how much less the hospitals involved will receive with the rate freeze in effect than what they would have received without the freeze. It is obvious that they will receive less. However, there is no information as to whether, for example, they will in fact be forced to alter the quality of services and care or to reduce the number of Medicaid patients or whether they will be able to continue to operate as before although perhaps at a reduced level of "profit".[5]
 
 
 37
 Plaintiffs' affidavits indicate that the hospital cost index increased between 7% and 9% for fiscal year 1982. See, e.g., affidavit of George J. Quinn, Vice President-Finance of WHA, Record Document 6. According to the affidavit of Timothy G. Riddle of WDHSS, the provisions of the amended stipulation would have resulted in average annual rate increases of 12.33%. Record Document 19.[6] Delaying an increase of this magnitude for three months would still provide an increase of approximately 9% for the year, and this appears to be at the upper end of the range of inflation (7-9%) indicated on the scale advocated by the plaintiffs. There thus appear to be significant differences in the outlooks presented by the plaintiff-hospitals and by the state of Wisconsin and, now that we have rejected a per se approach, such factual questions must be resolved by the district court.
 
 
 38
 One of the most important elements in determining whether the amended plan complies with federal criteria would be, if available, a determination by the Secretary of HHS. The regulations state that:
 
 
 39
 The Medicaid agency must make assurances satisfactory to the Secretary that the requirements ... of this section are met and that, in making significant changes in its methods and standards for determining payment rates, it has complied with the public notice requirements in Sec. 447.254.
 
 
 40
 42 C.F.R. Sec. 447.252(c) (1982). The Medicaid agency must submit such assurances "whenever the agency wishes to make a significant change in its methods and standards for determining the rate". 42 C.F.R. Sec. 447.255(a). In addition to the assurances, the agency must submit detailed information concerning the impact of any changes on different types of services. 42 C.F.R. Sec. 447.255(b). The Secretary has sixty days in which to act upon these assurances, but, if no action is taken within that time period, the assurances are deemed to be accepted. 42 C.F.R. Sec. 447.256(a).
 
 
 41
 In the present case, the state of Wisconsin did not submit assurances to HHS reflecting the three-month freeze because it contends that this is not a significant change. The issue of what constitutes a "significant change" has apparently not been litigated in recent decisions involving the 1981 amendments. Under prior regulations, any change which "is expected to increase or decrease Medicaid payments for [a particular] service by 1 percent or more during the 12 months following the effective date of the change" was considered to be significant and thus triggered the public notice requirements. 42 C.F.R. Sec. 447.205(a) (1981). The new regulations, in order to provide the states greater flexibility, do not specify any threshold amount applicable to a "significant change." 42 C.F.R. Sec. 447.254(a); Sec. 447.255(a) (1982). We note, however, that the state of Michigan in instituting a change which resulted in a less than 1% decrease in the average daily reimbursement rate still followed requirements for public notice and submission of assurances, although the state claimed it was not required to do so. Coalition of Michigan Nursing Homes, Inc. v. Dempsey, 537 F.Supp. 451, 459-60 n. 30, 463-64 and n. 42 (E.D.Mich.1982). Exactly what percentage impact the Wisconsin three-month freeze will have on the overall reimbursement rate over a year's time is not easily discernible in the record, but it seems likely to be in the range of approximately 2 to 3%.
 
 
 42
 While we do not think it is necessary, at this stage of the proceedings, to establish a threshold percentage at which the submission of assurances is required, scrutiny by HHS would do much to inform the district court as to the reasonableness and adequacy of the amended state plan under federal criteria. Of course, the Secretary's determination is subject to appropriate judicial review and so would not necessarily be final. However, such a prior determination seems particularly appropriate where the issue involves application of the reasonableness standard to a highly technical subject outside the conventional competence of the courts. See, e.g., Illinois Council on Long Term Care v. Miller, at 10,473; Coalition of Michigan Nursing Homes, Inc., 537 F.Supp. at 463. Thus, while it is not clear that the state of Wisconsin is required to submit assurances to HHS merely on the basis of a three-month freeze, review by the Secretary would assist the district court in making the sort of factual determinations required in this case.
 
 
 43
 Plaintiffs also contend that the freeze in rate increases violates federal standards because the legislature did not engage in the type of cost analysis required by the federal statute in deriving its fiscal formula. According to the plaintiffs' claim, the freeze was enacted on the basis of purely budgetary considerations and is therefore arbitrary and unreasonable.
 
 
 44
 The legislative history of the Omnibus Budget Reconciliation Act of 1981, which established the new federal standards for hospital reimbursement rates found in 42 U.S.C. Sec. 1396a(a)(13)(A), states:
 
 
 45
 In eliminating the current requirement that States pay hospitals on a Medicare "reasonable cost" basis for inpatient services under Medicaid, the Committee recognizes the inflationary nature of the current cost reimbursement system and intends to give States greater latitude in developing and implementing alternative reimbursement methodologies that promote the efficient and economical delivery of such services.
 
 
 46
 * * *
 
 
 47
 * * *
 
 
 48
 [W]hile the Committee recognizes that in this time of economic constraint and reductions in Federal funds for Medicaid, States must be given the flexibility necessary to improve the Medicaid reimbursement mechanism, the Committee does not want such policies to result in arbitrary and unduly low reimbursement levels for hospital services.
 
 
 49
 H.R.Rep. No. 158, 97th Cong., 1st Sess. 293-94 (1981). Thus Congress seems to have intended to permit states to develop methods for cost containment within the Medicaid system and to give states the flexibility to achieve this objective. However, states still cannot develop their plans "solely on the basis of budgetary appropriations," H.R.Conf.Rep. No. 1479, 96th Cong., 2d Sess. 154, reprinted in 1980 U.S. CODE CONG. & AD.NEWS 5526, 5944; neither would budgetary constraints excuse a failure to conform to the federal "reasonable and adequate" standard.
 
 
 50
 In Coalition of Michigan Nursing Homes, Inc., however, the court commented wisely that this "Congressional admonition must be taken with a grain of salt since the subsequent federal cutbacks obviously had an impact on a state's financial health, a factor Congress could not have ignored." 537 F.Supp. at 463 n. 41. See also Mississippi Hospital Association, Inc. v. Heckler, 701 F.2d 511, 518 (5th Cir.1983) (Congress intended to encourage Medicaid cost containment; therefore, states can consider cost efficiency and courts need not engage in motivation analysis); Illinois Council on Long Term Care, at 10,476 (states can consider budgetary constraints as long as they comply with federal standards). It seems clear, therefore, that the state of Wisconsin can consider its budgetary constraints in formulating amendments to its reimbursement rate plan, but its plan must still be independently evaluated for conformance to the "reasonable and adequate" standard. However, the burden of proof remains on the plaintiffs to establish that the plan is arbitrary and unreasonable or inadequate. Mississippi Hospital Association, Inc., 701 F.2d at 518.
 
 
 51
 The Congressional goal of checking inflation in reimbursed health care costs necessarily involves some slight degree of discomfort and sacrifice in the health care economy. Inflation cannot be curbed by a simplistic cost-plus approach, to be followed inflexibly without regard for the need to restrain costs. The health care industry--one peculiarly plagued by inflationary pressures--is not entirely exempt from measures essential to addressing inflation or reflecting pressures on public revenues. None of these factors, of course, can derogate from the statutory requirement that the rates conform to the "reasonable and adequate" standard.
 
 
 52
 The district court in the present case also considered at some length the effect of the Amended Stipulation, which had resolved the dispute in WHA II and which both parties had signed in June 1982, after the freeze statute went into effect on May 1, 1982. The court concluded that both parties had full knowledge of the freeze and its effects at the time they agreed to the Stipulation. Nonetheless, the plaintiffs were held not to be estopped by the Stipulation to challenge the validity of the freeze because the statute which enacted the freeze was unconstitutional and therefore could not be considered as applicable law. While the significance of the Stipulation will have to be considered upon remand, its interpretation does not seem to resolve the merits of this case and the issues of estoppel and waiver depend largely on determinations of knowledge and intent to be resolved as factual matters by the district court.
 
 
 53
 Finally, we must consider the issue of implementation of the amended plan during the interim in which the district court considers this case on remand. The district court had permanently enjoined implementation and enforcement of section 2033(5) once it found the statute unconstitutional. The district court also granted a preliminary injunction in a related case, Hillhaven Corporation v. Wisconsin Department of Social Services, No. 83-C-0016 (E.D.Wis. March 22, 1983), rev'd and remanded, No. 83-1726 (7th Cir. May 8, 1984), on the basis of its decision in the present case. If the plaintiffs, upon remand, seek to impose a preliminary injunction in the present case, the district court will need to consider the merits of that issue under the usual principles.
 
 
 54
 We should note, at this stage, the resolution of the issue of immediate enforcement of a state plan amendment in Illinois Council on Long Term Care v. Miller. The district court there denied the plaintiff's summary judgment motion and refused to grant a preliminary injunction because it considered it unlikely that the plaintiff, who was also challenging a freeze in Medicaid reimbursement rates, would succeed on the merits. Illinois had submitted its amended plan to HHS for approval but began to implement the plan before such approval was received. The plaintiff there claimed that a state could not implement a significant change until the Secretary approved it. The district court permitted the plan's implementation before the approval was given based on the court's construction of the federal statutory provisions.
 
 
 55
 The current federal statute, 42 U.S.C. Sec. 1396a(a)(13)(A), is unclear with respect to the exact temporal relationship between approval by the Secretary and implementation. The previous statute, however, clearly specified that a change in the state plan could only be incorporated after review and approval by the Secretary and notice of the Secretary's approval. 42 U.S.C. Sec. 1396a(a)(13)(D) (1976). The omission of this requirement, when considered in connection with Congress' previously noted statements that it intended to give the states greater flexibility and freedom from extensive federal oversight, suggests that proposed amendments may be implemented before approval is received from HHS.
 
 
 56
 In addition, the implementing federal regulations state that a proposed change is effective on the date specified by the state agency in its assurances submitted to HHS but in no event earlier than the first day of the calendar quarter in which the assurances are submitted. 42 C.F.R. Sec. 447.256(b)(1) and (2). Finally, in Illinois Council on Long Term Care, defendant HHS filed a statement that it interpreted the Medicaid statute in such a way "as to allow states the flexibility to implement Medicaid State Plan amendments prior to Federal approval." Id. at 10,475. Deference should be accorded to an agency's interpretation of its own implementing statute and therefore some weight should be given to this statement. See also Charleston Memorial Hospital v. Conrad, 693 F.2d 324, 332-33 (4th Cir.1982); Children's Hospital of Philadelphia v. Secretary of Department of Public Welfare, 568 F.Supp. 1001, 1007-09 (E.D.Pa.1983); Magee-Womens Hospital v. Heckler, 562 F.Supp. 483, 486 (W.D.Pa.1983).
 
 
 57
 The present case differs from Illinois Council on Long Term Care in one important respect--the state of Wisconsin has apparently not submitted the plan amendment to HHS for approval.[7] While we are not deciding that in the present case the state must submit its amendment to HHS, federal law, of course, requires the submission of significant changes to the agency. Once a plan has been submitted, agency action is required within sixty days or the plan is deemed accepted. Therefore, submission, with implementation in anticipation of approval, would not seem to impose a heavy burden because the interim period cannot last more than sixty days.[8]
 
 
 58
 On remand, therefore, we believe that the most important principles to be observed are, first, that submission to HHS of the revised plan by the state, whether voluntarily or as the result of a determination by the district court that the proposed change is significant, and a determination by the Secretary would provide major guidance to the district court in evaluating the reasonableness and adequacy of rate increases as affected by a freeze. Second, plaintiffs have the burden to demonstrate a significant adverse impact on their services, finances or other relevant concerns in order to show unreasonableness or inadequacy of the rate increases which will result if a freeze is implemented. Third, in general, the reasonableness of a rate increase may presumably cover a zone and is not necessarily defined by a single point.
 
 
 59
 For the foregoing reasons, we reverse the grant of summary judgment, vacate the issuance of a permanent injunction and remand to the district court for further proceedings consistent with this opinion.
 
 
 
 *
 Honorable Abraham L. Marovitz, Senior District Judge for the Northern District of Illinois, is sitting by designation
 
 
 [1]
 The "freeze" provision is contained in session laws denominated as "nonstatutory provisions." This provision will therefore not be published in the official Wisconsin Statutes
 
 
 [2]
 Plaintiffs refer to the statute's effect on rate increases as a "freeze," while the defendants use the terms "moratorium," "delay" or "continuation." Without intending to attach any particular significance to it, we shall use the term "freeze" primarily to conform to the district court's usage
 
 
 [3]
 The reduction averaged fifty cents of a $33.00 rate per patient per day which is used to calculate the actual allowable costs. The state did submit the proposed amendment to HHS and it was approved, although the state contended that this was not necessary because it did not consider the change to be significant. 537 F.Supp. at 459-60 n. 30
 
 
 [4]
 While Illinois Hospital Association and Illinois Council on Long Term Care refer to the same budgetary enactment, the descriptions of the effects, respectively, on hospitals and on nursing homes differ considerably. It seems that nursing homes were to have a one-year delay in rate increases, while hospitals were to have an actual reduction in reimbursement funds in comparison with the reimbursements for the previous year. The Wisconsin statute is much closer to that at issue in Illinois Council on Long Term Care (because neither involves an absolute reduction in reimbursement), but the Wisconsin statute is even less drastic than the Illinois provision since the former entails only a three month rather than a full year postponement in rate increases
 
 
 [5]
 Non-profit organizations are not barred from making a "profit" or "surplus"; they are only restricted in the ways in which they use their profits (that is, they cannot distribute "profits" to owners or shareholders). Thus, while non-profit institutions may be able to provide services at lower rates than proprietary institutions because the former need not directly consider investors' return on investment and because they receive various tax advantages, the situation of non-profit and for-profit institutions with respect to such factors as cost containment and need for reimbursement of both fixed and variable costs would be substantially the same
 
 
 [6]
 According to Quinn's affidavit, the reimbursement rate increase without the freeze would be 7 to 9%, corresponding to the increase in the hospital cost index. Riddle's affidavit states that application of the Amended Stipulation would have resulted in average annual rate increases of 12.33%. This is but one example of the factual inconsistencies in the record which the district court should resolve upon remand
 
 
 [7]
 The record appears inconsistent on even the relatively simple issue of whether assurances reflecting the freeze for fiscal year 1983 were submitted to HHS. The affidavit of Richard Lewandowski, attorney for WHA, states that Karl Rajani, Chief, Institution Rate-Setting & Audit Section, Bureau of Health Care Financing, Wisconsin Department of Health and Social Services, said that no assurances had been filed with HHS with respect to the three-month freeze on Medicaid reimbursement rates. Record Document 10 (filed August 25, 1982). However, in its Answer and Affirmative Defense, filed on September 13, 1982, in the district court proceedings, the state alleged that assurances would be submitted to HHS for the period April 1, 1982 to April 1, 1983 by June 30, 1983. Since that period included the period during which the freeze was to be implemented, it is possible that assurances reflecting the effects of the freeze were actually submitted. The state, of course, relies on its contention that it is not required to submit assurances because it does not consider this change to be significant under the federal statute
 
 
 [8]
 Whether the agency actually accepts the assurances or instead fails to act and the assurances are deemed accepted may affect the court's consideration of the significance of the acceptance and the standard of review to be applied. See Illinois Council on Long Term Care, at 10,473