WILMAC CORPORATION, d/b/a
Heatherbank Rehabilitation and
Nursing Center

v.

Margaret M. HECKLER, Secretary of the
United States Department of Health
and Human Services; and Walter W.
Cohen, Secretary of the Pennsylvania
Department of Public Welfare.

Civ. A. No. 84–5491.

United States District Court,
E.D. Pennsylvania.

April 8, 1986.

---

Joel M. Hamme, Washington, D.C., Charles O. Barto, Jr., Harrisburg, Pa., for plaintiff.

John O.J. Shellenberger, Deputy Atty. Gen., Dept. of Welfare, Harrisburg, Pa., Diane C. Moskal, Reg. Atty., Health and Human Services, for Heckler.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

This case comes before the Court on cross-motions for summary judgment. There are no material facts in dispute. The Court is required to decide only legal issues concerning the propriety of certain regulations promulgated by the Pennsylvania Department of Welfare and approved by the Secretary of Health and Human Services.

Plaintiff Wilmac, a proprietor of nursing homes, wants to expand Heatherbank, a skilled nursing facility which provides long-term and intermediate care, as well as rehabilitation services, by adding ninety (90) new intermediate care beds to Heatherbank's existing one hundred eighty (180) beds.

Heatherbank is located in Columbia, Lancaster County. It is a participant in the

Medicaid program through which the federal government and the state cooperate to provide free or reduced cost medical care to the indigent. Pursuant to new state regulations developed in response to a statutory change in Medicaid's reimbursement standard, Wilmac will not receive any state funds for capital costs and depreciation in connection with the new beds and facilities if they are subsequently certified for Medicaid patients. Under the prior state regulations, such beds and facilities would have been included in reimbursable costs. Wilmac brought the instant action to have the new regulations invalidated before proceeding with its plans to expand Heatherbank.

In order to clarify the issues, it will be helpful to set forth the statutory and regulatory background of this dispute before proceeding to a discussion of the parties' contentions.

### I. Federal Statute and Regulations

Under the Medicaid statute, Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, a state that chooses to participate in the Medicaid program is empowered to develop its own plan for doing so, subject to regulations promulgated by the Department of Health and Human Services. The state plan must be approved by the Health Care Financing Agency (HCFA), through which Medicaid is administered, to assure compliance with the federal regulations.

At its inception, the Medicaid statute was not specific in its regulation of allowable costs and reimbursement rates, but in 1972, Title XIX was amended to require payment by the states to providers of skilled nursing and intermediate care on a reasonable costs-related basis, as determined in accordance with methods and standards developed on the basis of cost finding methods approved and verified by the Secretary of Health and Human Services. (Social Security Amendments of 1972, Pub.L. No. 92–603, § 249(a) 86 Stat. 1329).

However, in 1980, Congress retreated from a specific reimbursement formula once again when it passed the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A). The newest statutory standard requires that the state find and make assurances to the Secretary of Health and Human Services that rates of reimbursement are

reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable state and Federal laws, regulations and quality and safety standards. *Id.*

To implement the Boren Amendment, HHS published final regulations in December, 1983, requiring states to specify methods and standards used to set reimbursement rates and to certify to HCFA annually that its payments to nursing homes satisfy the literal terms of the statute, *i.e.*, that they are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities. *See,* 42 C.F.R. § 447.250—447.280. A state is also required to make such a certification whenever it makes a significant change in its payment methods and standards. In addition to the assurances that are to accompany significant state plan changes, HHS also requires that related information consisting of estimated average payment rates and the estimated effect of rate changes on availability of services, type of care furnished and extent of provider participation be furnished.

### II. State Regulations

The Commonwealth of Pennsylvania has always been a Medicaid participating state providing skilled nursing and intermediate care facility services to the categorically and medically needy. The Department of Public Welfare (DPW) is the administering agency for the state plan. Methods and standards for determining state plan reimbursement rates for skilled nursing and intermediate care facility services are found in the Manual for Skilled Nursing and Intermediate Care Facilities, initially approved by HCFA in 1978.

Although the Manual had been amended from time to time prior to the amendments

at issue in this case, the basic payment method remained the same, and, in fact, is still in force. Reimbursement is determined by means of a *per diem* rate consisting of three components: operating costs, depreciation and interest on capital indebtedness. Each component of the total rate is defined in terms of allowable costs and is otherwise limited in various ways. For example, allowable operating costs are subject to ceilings. Depreciation is subject to prescribed limits on the depreciable basis of assets. Interest is subject to both rate limits and limits on the amount of capital indebtedness upon which interest is paid.

The component amounts are determined by dividing the total amount of allowable costs in each category by the total number of patient days. Payments are made on an interim basis throughout the year by multiplying the *per diem* rate by a facility's number of Medicaid patient days. At the end of each fiscal year, an audit determines final allowable costs, rates and payment amounts. A final operating cost rate below the specified ceiling entitles the facility to an efficiency incentive payment up to the ceiling amount. After audit, any facility that has exceeded its ceiling is required to reimburse DPW for the overpayment.

In November, 1982, HCFA approved two amendments to the state plan. The first revised the method of calculating operating cost rate ceilings. The second, at issue here, placed a moratorium on reimbursement of the depreciation and interest components of the *per diem* rate on new or additional beds for facilities which are issued a certificate of need or letter of nonreviewability for a project after August 31, 1982.[1] Thus the *per diem* rate for such new or additional beds now consists only of allowable operating costs, subject, of course, to the ceiling. This amendment does not affect the calculation of *per diem* rates for existing beds, which are still determined by reference to the three components of the *per diem* rate as described above.

For the first amendment, which altered the method of calculating the operating cost ceiling, DPW made the assurances required by the Boren Amendment implementing regulations for significant plan amendments. The amendment which altered the *per diem* rate components, however, was accompanied by assurances that the regulations were not applicable because the change sought was not significant.

Subsequently, another amendment, requiring county-owned facilities to determine costs in accordance with the Manual, including the elimination of the depreciation and interest components for new beds, was submitted to HCFA for approval. Finally, in September, 1983, a rewritten Manual, incorporating all of the aforementioned amendments but otherwise making no changes in the basic reimbursement method, was submitted to HCFA along with the required assurances. It was approved in November, 1983. Since that time DPW has continued to submit its annual Boren Amendment assurances.

### III. The Issues

Wilmac's seventeen-count complaint can be divided into several classes of claims. First, it contends that DPW has violated both the Medicaid statute and its imple-

---

1. A Certificate of Need (CON) is granted by a state's health planning and development agency (SHPDA) upon the recommendation of a regional health systems agency (HSA) pursuant to the requirements of the National Health Planning and Resources Development Act (NHPRDA), 42 U.S.C. § 300*k, et seq.* In Pennsylvania, the designated SHPDA is the Department of Health (DOH).

The NHPRDA mandates that participating states enact legislation requiring health care facilities to seek and obtain prior approval of, *inter alia,* construction projects exceeding a specified amount as a condition of state licensing. Approval is granted if the HSA and SHPDA determine that the project meets certain conditions related to health care needs in the area where the proposed project will be located.

The announced purpose of this statute is to improve access to health care while reducing cost increases through improved planning and incentives to health care providers to develop and use alternatives to the most expensive and inflation-prone health care services. 42 U.S.C. § 300*k.*

menting regulations by eliminating reimbursement for interest and depreciation with respect to new beds. (Counts I—VIII). Second, plaintiff claims that the DPW regulations also violate portions of the National Health Resources Planning and Development Act (NHRPDA), specifically 42 U.S.C. § 300m–1(b)(1) and its implementing HHS regulations found at 42 C.F.R. § 123.104(b)(1) (Counts IX—XI). Third, there are three constitutional claims: that DPW violated the Supremacy Clause, the plaintiff's Fourteenth Amendment right to due process, and 42 U.S.C. § 1983 (Counts XII—XIV). Finally, Wilmac asserts that the Federal agencies responsible for oversight of Pennsylvania's Medicaid reimbursement program also violated the Medicaid statute (Count XV), the NHPRDA (Count XVI) and the Due Process Clause of the Fifth Amendment (Count XVII).

Plaintiff seeks a declaratory judgment that the DPW regulations are invalid as violative of relevant Federal statutes and the United States Constitution and an injunction against their application. Similarly, it seeks a declaratory judgment that HHS approval of the disputed regulations was contrary to law and an injunction against future approval of similar regulations. Wilmac also requests attorneys' fees and costs.

In essence, plaintiff is asking the Court to determine that the construction of new beds is a cost which must be incurred by an efficiently and economically operated nursing home in order to provide the level and quality of medical care that Congress intended to furnish to the indigent. Implicit in that assertion is the contention that failure to reimburse capital costs for new beds that may be certified for Medicaid patients would automatically render state reimbursement rates for those beds inadequate and/or unreasonable in violation of the Medicaid statute.

There is no issue, however, as to whether capital costs in general were intended to be or need to be part of a state's reimbursement plan as plaintiff suggested both in its briefs and at oral argument. It is clear that as to existing nursing home beds, already certified for Medicaid patients, Pennsylvania has always included capital costs as part of its reimbursement scheme and continues to do so. Moreover, the moratorium does not extend to capital costs for the replacement of existing Medicaid beds. Thus, insofar as this plaintiff is concerned, the moratorium affects only future construction of additional facilities.

## IV. Title XIX Claims

Before reaching the substantive issues presented by the complaint, with respect to Title XIX, there are two procedural questions raised by the defendants that merit discussion. Both the state and federal defendants contend that a health care provider has no standing to assert claims under Title XIX.[2] The state defendant also asserts that Title XIX confers no private right of action upon the plaintiff.

It appears that the existence of a private right of action under Title XIX has been at least implicitly recognized since there are numerous federal court cases in which providers of health care services have sued to challenge various aspects of state reimbursement schemes. *See, e.g., Minnesota Association of Health Care Facilities v. Minnesota Department of Public Welfare*, 602 F.2d 150 (8th Cir.1979); *Washington State Health Facilities Association v. State of Washington Department of Social and Health Services, et al.*, 698 F.2d 964 (9th Cir.1982); *Edgewater Nursing Center, Inc. v. Jeffrey C. Miller, et al.*, 678 F.2d 716 (7th Cir.1982); *The Children's Hospital of Philadelphia, et al. v. The Secretary of Department of Public Welfare of the Commonwealth of Pennsylvania, et al.*, 568 F.Supp. 1001 (E.D.Pa.1983); *Troutman, et al. v. Cohen, et al.*, 588 F.Supp. 590 (E.D.Pa.1984). Moreover, although it is true that the Supreme Court

---

**2.** In its brief in opposition to defendants' motions for summary judgment plaintiff asserts that the federal defendant does not challenge its standing to sue, but such is not the case. *See,* Federal Defendant's Motion for Summary Judgment, Doc. # 27 at 10.

has become somewhat stricter in recent years in implying a private right of action to enforce statutory benefits and obligations, it has itself joined the lower federal courts in recognizing the existence of a private right of action in this context without explicit discussion when it held that physicians had standing to challenge state Medicaid regulations on behalf of their patients in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). The Court could hardly conclude that the plaintiffs there had standing if their right to a cause of action was in doubt.

■ The *Singleton* case, along with the other cases noted above, also establishes that Wilmac has standing to challenge the state regulations in issue and the propriety of HHS approval of them. In *Singleton* the Court identified and resolved two distinct questions with respect to a plaintiff's standing: whether he himself suffers a concrete injury from the operation of the challenged law and whether the plaintiff who brought the action can properly assert the legal rights sought to be vindicated. With respect to the former question, the Court noted that the *Singleton* plaintiffs, as Medicaid providers, suffered economic injury by the elimination of certain reimbursable costs for which they would have been eligible but for the amended state regulations which they challenged. By the same token, the plaintiffs' success on the merits would result in a benefit to them in the form of the payments for which they would again become eligible.

Here, a similar situation exists. But for the moratorium on Medicaid reimbursement for the capital costs associated with the construction of new beds, Wilmac would be eligible for public funds to help defray the capital costs of its proposed expansion of Heatherbank. If the regulations are invalidated, it would again be able to receive that benefit.

■ With respect to whether, as a prudential matter, nursing home proprietors should be permitted to assert claims under Title XIX, we reiterate that the consensus of the federal courts, as gleaned from the previously cited cases, has been that providers can properly seek to enforce the reimbursement standards of the Medicaid statute both in their own right and as representatives of Medicaid recipients.

Turning to the substance of the plaintiff's Title XIX claims, we consider first the sufficiency of the HHS review of the DPW regulations. Plaintiff's first contention in this regard is that it was error for the Secretary to accept DPW's representation that the moratorium did not involve a significant change in the state's Medicaid reimbursement scheme.

An HHS reviewer of state Medicaid plans, Tzvi Hefter, testified at a deposition as to the HHS procedure for reviewing such representations and the rationale behind it. (Exhibit C to Plaintiff's Motion for Summary Judgment, Doc. # 25). Since the Boren Amendment, which reduced Federal oversight of state Medicaid plans, HHS does not engage in a prolonged review of amendments that a state considers to be insignificant where it appears that no immediate changes in current reimbursement levels will occur as a result of the proposed amendment. Because the moratorium would affect only additional Medicaid beds, not yet under construction, HHS concluded that the state was correct in its assertion that the plan amendment was insignificant.

Federal courts that have considered the issue agree that one of the purposes and effects of the Boren Amendment was to reduce federal oversight of the details of state reimbursement plans under Medicaid. As noted in *Alabama Hospital Association v. Beasley*, 702 F.2d 955, 957 (11th Cir.1983),

... [T]he new provision uses different language to describe the role of the Secretary in assessing methodologies proposed by the states. Whereas the former provision stated that state plans shall be 'reviewed and approved by the Secretary', the new provision provides that the state must find and make 'assurances satisfactory to the Secretary' that

the methodology fulfills statutory requirements.

Likewise, the Seventh Circuit characterized the Boren Amendment as a change in the federal Medicaid reimbursement standard which "provided for both more stringent cost containment and less federal oversight of state reimbursement methodologies". *Wisconsin Hospital Association v. Reivitz*, 733 F.2d 1226, 1228 (7th Cir.1984).

■ In light of the reduced oversight and greater flexibility provided by the Boren Amendment, as well as the absence of an immediate effect on reimbursement from the state's proposed moratorium, the Court concludes that the Secretary was within her discretion when she accepted Pennsylvania's representation that the capital cost moratorium on new construction was an insignificant change in the state's plan.

■ Moreover, it is important to remember that the initial assurance of insignificance was controlling only until such time as the state made its annual assurance to the Secretary that the state reimbursement plan, as amended, conformed to the statutory standard. Thus, the heart of our inquiry is whether Pennsylvania's current Medicaid plan provides for reasonable and adequate reimbursement rates, and whether the Secretary was correct is so concluding.[3]

■ Wilmac buttresses its argument that the moratorium is not a lawful means of cutting costs by reference to a report from Pennsylvania's Independent Regulatory Review Commission (IRRC), authorized under state law to review the regulations of state agencies. The IRRC's conclusion that the DPW regulations are not in accordance with federal law is not, of course, binding upon the Court in its review of the regulations in light of the stat-

utory standard but could be persuasive if well-reasoned and amply supported. We do not find that to be the case.

It is apparent that the standards as applied in the IRRC report are not precisely the standards mandated by the Medicaid statute. For example, the IRRC report starts with the premise that federal law requires that the states not base Medicaid reimbursement rates on budgetary constraints. (Exhibit M to Plaintiff's Motion for Summary Judgment at 2–38). In fact, the statute mandates only that rates not be based *solely* on budgetary constraints. The Boren Amendment was enacted primarily to encourage cost-cutting and allow the states to deal with budgetary constraints brought about by reduced federal funds for Medicaid. *Wisconsin Hospital Association v. Reivitz, supra.*

■ In addition, in discussing the DPW moratorium in light of the statutory standard, the IRRC report refers to the legislative "mandate" that "the reimbursement system be based upon reimbursement of reasonable costs that an efficiently operated facility *would* incur". (*Id.*) (emphasis added). This statement alters the true statutory mandate in two important respects. First, the Boren Amendment abolished the "reasonable cost-related basis" of reimbursement, and instituted a lower standard, requiring only that overall rates of reimbursement be reasonable and adequate. *Alabama Hospital Association v. Beasley, supra.* Second, the rates must be reasonable and adequate to meet costs which *must* be incurred. Obviously, additional capital costs would be incurred by any facility seeking to expand and if that were the standard, the moratorium may violate it as the IRRC concluded. That conclusion is flawed, however, by the IRRC's reliance upon a false premise.

---

**3.** In reviewing Pennsylvania's Medicaid plan and the Secretary's review thereof we must be mindful of the limited role accorded the federal courts in these matters:

... [O]ur role does not extend to reweighing or rethinking the political and financial concerns behind a particular payment plan.

A district court can, of course, decide whether federal law has been violated. Otherwise its review of nonadjudicatory federal agency action is limited to deciding whether the action is arbitrary or capricious. (citation omitted). *Mississippi Hospital Association v. Heckler,* 701 F.2d 511, 516 (5th Cir.1983).

■ It is axiomatic that all statutory construction begins with the words of the statute itself. No reviewing or interpreting body can hope to discern the "spirit" of a law if it disregards its express language.[4] Because it is obvious that the IRRC grounded its analysis upon misstatements of the law itself, we decline to accord it any weight in our consideration of the validity of the DPW moratorium.

■ Obviously, the moratorium on reimbursement of capital costs of new construction of nursing home facilities reflects a policy choice that has a negative impact on nursing home proprietors who have a vested interest in encouraging institutional care for the elderly and chronically ill. That is not necessarily the state's interest, however, and it is perfectly free to discourage new construction by reducing Medicaid funds for such projects as long as its overall rates of reimbursement are reasonable and adequate to meet costs which must be incurred by efficiently and economically operated facilities to maintain adequate levels of patient care.[5] We reiterate that it is not the Court's task to evaluate or comment upon the state's policy choices. Nor is it our task to predict the future, as plaintiff suggests we do, and decide today that if new construction takes place, if the new beds are subsequently certified for Medicaid patients and if the moratorium is still in effect when Heatherbank begins to receive reimbursement for those proposed new beds, the rates paid will then be unreasonable and/or inadequate. Rather, we must examine the situation as it exists today in determining whether the DPW reimbursement plan comports with the Medicaid statute.

## V. Other Claims

■ Besides attacking both the federal and state defendants' procedures and results with respect to Title XIX, Wilmac also contends that the state regulations violate the Supremacy Clause and Due Process. Since we have concluded that the regulations are not unlawful under the Medicaid statute they obviously do not violate the Supremacy Clause. Plaintiff's due process claims are based upon the argument that it has a protected property interest in Medicaid reimbursement, a claim not in issue here. Moreover, whatever property interest Wilmac may have is limited by the reasonable and adequate standard. As long as Wilmac continues to receive reasonable and adequate reimbursement, it has not been deprived of its property interest, if any, in Medicaid funds.

Wilmac's remaining claim also implicates the Boren Amendment standard and hence Wilmac's Title XIX claims, and so merits some discussion. Plaintiff contends that because it received a Certificate of Need for the Heatherbank project, pursuant to the NHPRDA, the proposed expansion should receive federal funding through Medicaid. The underlying argument appears to be that the CON renders the Heatherbank project essential, thereby making the capital investment a cost which must be incurred by an efficiently and economically operated facility. This contention requires a decision as to whether the NHPRDA was intended to operate in tandem with the Medicaid statute in that manner.[6] Put another way, is a state's imple-

---

4. In fact, Pennsylvania law requires that its agencies not pursue the "spirit" of legislation while ignoring the chosen words of the legislature and that they make every effort to effectuate the lawmakers' intentions. *See,* 1 Pa.Con. Stat.Ann. § 1921. Those rules should apply with equal force when a state agency purports to interpret federal law.

5. That the moratorium reflects a conscious effort on the part of the state to encourage alternatives to institutional care by limiting the expansion of nursing home facilities is abundantly clear. *See,* Memoranda of Gerald F. Radke con-

tained in Exhibit P to Plaintiff's Motion for Summary Judgment.

6. In reaching this issue we are aware of having passed over the threshold questions of whether plaintiff has an implied private right of action and standing under the NHPRDA. Although these might be determinative issues if Wilmac's claims under the NHPRDA were independently asserted, we address the substance of the NHPRDA issues here as part and parcel of plaintiff's claim that the DPW regulations violate federal law.

menting agency for Medicaid required to take into account the actions of the state's health planning agencies under the NHPRDA in promulgating Medicaid regulations?

■ Although it appears that Pennsylvania and HHS have required exactly that to the extent that no reimbursement for capital expenditures is allowed unless the facility has obtained a CON,[7] the converse, *i.e.*, that the CON entitles a facility to capital reimbursement under Medicaid, is unsupportable. A CON under the NHPRDA may only be obtained upon a showing that capital and operating funds for the project are available. 35 Pa.Stat. Ann. § 448.707(a)(5), (6), (8), (9). Wilmac must have been able to show that it had adequate capital for the Heatherbank project without Medicaid capital reimbursement in order to secure a CON since it sought same as recently as March of 1983, while the DPW capital cost moratorium became effective in September, 1982, six months prior thereto. Thus, neither Wilmac nor DOH could have assumed that Medicaid reimbursement for capital costs would be a part of the funds available for the project.

Moreover, the NHPRDA itself is but another attempt to contain health care costs by assuring that long-term care facilities, for example, are needed, financially feasible and would have no adverse impact on existing health care delivery systems. *See,* 42 U.S.C. § 300*k*-2(a)(13), (17). The burden is on the applicant to so demonstrate to the regional HSA before a CON is issued. 35 Pa.Stat.Ann. § 448.702. Thus, the reality is not, as plaintiff suggests, that the state agencies involved determined that the expansion of Heatherbank is a project essential for adequately meeting the need for inpatient intermediate care, but rather that Wilmac was able to convince the health care planning agencies that it could build and operate the new wing in accordance with statutory conditions. See, 42 U.S.C.

§ 300*l*-2(a)(4), *m*-6(a), 35 Pa.Stat.Ann. § 448.707(a), (b). Plaintiff cannot now be heard to argue that it needs the assurance of Medicaid reimbursement for capital costs in order to implement the project and that the CON it holds means that these capital costs must be incurred within the meaning of the Boren Amendment. It would turn the entire Congressional effort toward health care cost containment into an exercise in futility to construe the NHPRDA as requiring a greater expenditure of Title XIX funds than the Medicaid-administering agencies have found necessary under the Medicaid statute and its implementing regulations.

With all of plaintiff's substantive claims thus eliminated, there is no longer any basis for its § 1983 claims. Having concluded that both the state and federal defendants acted in accordance with the law in promulgating and approving the moratorium on Medicaid reimbursement of capital costs for new construction, judgment will be entered for the defendants on all counts of the complaint.

---

**7.** This appearance is deceiving, however. Medicaid reimbursement for capital costs is related to a facility's having obtained a CON only because new construction in itself is prohibited unless the CON has been granted. 35 Pa.Stat. Ann. § 448.707(a)(9).