WISCONSIN HOSPITAL ASSOCIATION, a Wisconsin not-for-profit corporation; St. Joseph's Hospital, Milwaukee, Wisconsin, a Wisconsin not-for-profit corporation; St. Luke's Hospital, Milwaukee, Wisconsin, a Wisconsin not-for-profit corporation; and St. Vincent Hospital, Green Bay, Wisconsin, a Wisconsin not-for-profit corporation, Plaintiffs,

v.

Linda REIVITZ, Secretary, Wisconsin Department of Health and Social Services; and Charles P. Smith, Treasurer, State of Wisconsin, Defendants.

No. 82–C–1055.

United States District Court,
E.D. Wisconsin.

March 18, 1986.

Jon P. Axelrod, Richard J. Lewandowski and Pamela B. Anderson, DeWitt, Sundby, Huggett, Schumacher & Morgan, S.C., Madison, Wis., for plaintiffs.

Gerald S. Wilcox, Asst. Atty. Gen., Dept. of Justice, Madison, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

Plaintiffs commenced this action seeking to permanently enjoin the defendant state officials from enforcing a three-month Medicaid reimbursement rate freeze. Plaintiffs also sought a declaratory judgment that the Wisconsin law providing for the Medicaid freeze violates federal law and is therefore unconstitutional under the Supremacy Clause. In its *Decision And Order* dated January 11, 1983, the Court granted summary judgment in the plaintiffs' favor finding that 1981 Wis.Laws Ch. 317, § 2033(5) ("the freeze"), violated 42 U.S.C. § 1396a(a)(13)(A) and was therefore unconstitutional under the Supremacy Clause. Accordingly, the Court permanently enjoined the defendants from implementing and enforcing the freeze.

On May 8, 1984, the Court of Appeals for the Seventh Circuit reversed the grant of summary judgment, vacated the issuance of a permanent injunction and remanded to this Court for further proceedings. *Wisconsin Hospital Association v. Reivitz*, 733 F.2d 1226, 1238 (7th Cir.1984). The Seventh Circuit found that the freeze would not violate 42 U.S.C. § 1396a(a)(13)(A) if the resulting Medicaid reimbursement rate fell within a "zone of reasonableness." *Id.* at 1233. Further, the panel determined that the present state of the record lacked the technical data necessary to determine whether the resulting reimbursement rates were adequate and reasonable. *Id.* at 1234. To aid in resolving the "reasonable and adequate" issue, the Seventh Circuit urged the defendants to submit assurances to the Secretary of the United States Department of Health and Human Services ("USDHHS"). Specifically, the panel stated:

[S]crutiny by HHS would do much to inform the district court as to the reasonableness and adequacy of the amended state plan under federal criteria. Of course, the Secretary's determination is subject to appropriate judicial review and so would not necessarily be final. However, such a prior determination seems particularly appropriate where the issue involves application of the reasonableness standard to a highly technical subject outside the conventional competence of the courts. [citations omitted]. Thus, while it is not clear that the state of Wisconsin is required to submit assurances to HHS merely on the basis of a three-month freeze, review by the Secretary would assist the district court in making the sort of factual determinations required in this case.

*Id.* at 1235.

On remand, this Court was directed to observe the following principles:

first, that submission to HHS of the revised plan by the state, whether voluntarily or as the result of a determination by the district court that the proposed change is significant, and a determination by the Secretary would provide major guidance to the district court in evaluating the reasonableness and adequacy of rate increases as affected by a freeze. Second, plaintiffs have the burden to demonstrate a significant adverse impact on their services, finances or other relevant concerns in order to show unreasonableness or inadequacy of the rate increases which will result if a freeze is implemented. Third, in general, the reasonableness of a rate increase may presumably cover a zone and is not necessarily defined by a single point.

733 F.2d at 1237–38. As discussed below, the State did not submit the revised plan to HHS and the plaintiffs have demonstrated that the freeze impacts them in a significantly adverse fashion. Further, the issue concerning the reasonableness of the rate increase was mooted by plaintiffs' abandonment of their claim that the freeze reimbursement rates were outside a "zone of reasonableness." *Plaintiffs' Letter to the Court* of May 18, 1984.

A two-day trial was conducted before this Court, commencing on September 6, 1984. The following three issues were tried to the Court: (1) whether the freeze was void because Wisconsin ("the State") failed to comply with the procedures required by the applicable federal regulations; (2) whether the freeze impermissibly impaired the obligations of contract in violation of U.S. Const. art. I, § 10 because it violated the State's provider agreements with the plaintiff hospitals; and (3) whether the freeze violated the Amended Stipulation which settled *Wisconsin Hospital Association v. State of Wisconsin Department of Health and Social Services,* No. 80–C–1012 (E.D.Wis.).

In addition, defendants raised one issue in their defense. Defendants asserted that the relief sought by plaintiffs was barred by the Eleventh Amendment to the United States Constitution which permits only prospective relief and prohibits any judgment for past liabilities that must be satisfied from a state's general reserves.

## BACKGROUND

The Medicaid program, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.,* provides reimbursement by the federal government of a portion of the payments made by participating states to hospitals providing medical care to the indigent. Wisconsin has elected to participate in the Medicaid program. It has entered into a plan for Medicaid Assistance under Title XIX of the Social Security Act (State Plan) which has been approved by USDHHS.

Plaintiff Wisconsin Hospital Association (WHA) is a Wisconsin not-for-profit corporation representing 142 acute general care hospitals in Wisconsin. Plaintiffs St. Joseph's Hospital, Milwaukee, St. Luke's Hospital, Milwaukee, and St. Vincent Hospital, Green Bay, are all acute general care hospitals. All plaintiff hospitals and all acute general care hospital members of the WHA have signed "provider agreements" with the Wisconsin Department of Health and Social Services (DHSS) whereby the DHSS has agreed to reimburse them for services to Medicaid patients according to the terms contained in the State Plan.

Defendant Linda Reivitz is the Secretary of the DHSS and is charged by Wis. Stat. § 15.19 with the direction and supervision of that department. Along with its other duties, the DHSS is the federally-designated agency that administers and supervises the State Plan.

Defendant Charles P. Smith is the Treasurer of the State of Wisconsin. Wis.Stat. § 14.58(1) requires him to receive and have charge of all money paid into the State treasury and to pay out State money as directed by law which would include money used to finance the Medicaid program.

The Court notes that this is not the first time that these parties have appeared before it in cases challenging the Medicaid reimbursement method enacted by the State of Wisconsin. In *Wisconsin Hospital Association v. Schmidt,* No. 75–C–382 (E.D.Wis. Apr. 29, 1976) (*WHA I*), this Court found that a state order freezing all Medicaid cost reimbursement conflicted with governing federal law which required reasonable reimbursement and that the state order violated the Supremacy Clause of the United States Constitution. More recently, in *Wisconsin Hospital Association v. State of Wisconsin, Department of Health and Social Services,* No. 80–C–1012 (E.D.Wis. July 21, 1982) (*WHA II*), WHA challenged the State Plan asserting that it failed to provide reasonable reimbursement of Medicaid providers. The lawsuit was settled by an Amended Stipulation adopted by this Court in an Order signed July 21, 1982.

The Court now turns to a description of the State's Medicaid reimbursement plan prior to the current freeze. The relevant federal statute provides that Medicaid providers be reimbursed by rates:

> which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities....

42 U.S.C. § 1396a(a)(13)(A).

Under the State Plan, the hospitals receive interim payments at an "Interim Inpatient Rate Per Discharge," which is established at the beginning of each hospital's fiscal year. "Final Settlement" is not made, however, until after the close of the hospital's fiscal year when an actual "Per Discharge Rate" is established. Upon Final Settlement, the hospital is reimbursed based on the Per Discharge Rate with the interim cash-flow payments serving as a credit against the amount due.

Attachment 4.19A of the State Plan, approved by USDHHS, specifies the "Methods for Payment of Reasonable Costs" for covered inpatient hospital care. Paragraph IV of Attachment 4.19A defines the rate setting method whereby "an all-inclusive rate for discharge will be retrospectively established for each hospital." This rate is established using a "Hospital Cost Index."

> After the close of each hospital's accounting year, the hospital cost index will be calculated to account for actual changes in the input price index. The hospital cost index will be applied on a cumulative basis to the hospital rates per discharge for the base year to determine its rate for discharge for the final settlement year.

State Plan, § IV, B. This method insures reimbursement on a reasonable cost basis by establishing a reasonable cost in the base year and then adjusting that rate based on the Hospital Cost Index in subsequent years.

The Court now turns to the freeze's impact upon the plaintiff hospitals' reimbursement rates. On April 30, 1982, the Wisconsin Legislature enacted Chapter 317, Laws of 1981. Section 2033(5) of Chapter 317 states:

> Notwithstanding any other law, nursing home reimbursement rates established for 1982 shall remain in effect to March 31, 1983, and reimbursement rate increases to other providers of medical assistance that are scheduled to take effect on or after July 1, 1982 and before July 1, 1983 are delayed for 3 months after the date that they would otherwise take effect.

Simply put, at Final Settlement, reimbursement for the first three months will be based on the reimbursement rates in effect for the previous fiscal year, and for the remaining nine months reimbursement will be based on the new reimbursement rates established for the current fiscal year based on the Hospital Cost Index.

### DISCUSSION

The Court will first address defendants' Eleventh Amendment argument. Following this, the Court will resolve the plaintiffs' three causes of action asserted at trial.

### I.  The Eleventh Amendment Defense.

Defendants contend that the relief sought by plaintiffs is retroactive in nature and is therefore barred by the Eleventh Amendment to the United States Constitution. Defendants' position is that the State's legal duty to reimburse plaintiff hospitals for services rendered accrues at the time they are performed. That the exact amount owed is determined at Final Settlement, defendants' assert, does not diminish the State's legal obligation to pay once the services have been rendered. The defendants' bolster their position with a collateral estoppel argument based on this Court's February 8, 1982 Interlocutory Order in *WHA II.* In that Order, the Court held that the same relief sought by the plaintiffs in the present case was retroactive in nature and therefore barred by the Eleventh Amendment. *Wisconsin Hosp. Ass'n. v. State of Wisconsin,* No. 80–C–

1012, *Interlocutory Order* at 6 (E.D.Wis. February 8, 1982). The Court stated:

> Although a hospital may not know the actual dollar amount it will receive for the year until the final audit has been completed, the reimbursement methodology is set in advance of the rate year and is contained in the State's approved plan. That audit adjustment might occur at the end of the rate year does not alter the retroactive nature of the relief sought.

*Id.*

The plaintiffs' response is that only at Final Settlement are the parties' rights and duties fixed and enforceable rights created. Further, plaintiffs assert that this Court is not bound by its preliminary, non-final ruling in *WHA II.* Because *WHA II* was settled, rendering an appeal impossible, plaintiffs contend that the Court's February 8, 1982 ruling should not have collateral estoppel effect in resolving the same issue in the present case.

■ Initially the Court determines that collateral estoppel does not preclude the Court from again resolving this issue. The Court's February 8, 1982 ruling in *WHA II* certainly resolved this particular issue between these same parties. However, this ruling did not dispose of *WHA II.* Moreover, before *WHA II* was completely resolved on the merits, the parties entered into a stipulation and the case was dismissed. This settlement precluded the plaintiffs from challenging the Court's interlocutory Eleventh Amendment ruling on appeal or pursuant to a motion for reconsideration.[1]

In *Luben Industries, Inc. v. United States,* 707 F.2d 1037 (9th Cir.1983), the Ninth Circuit discussed the propriety of the district court's failure to give preclusive effect to an interlocutory order issued in a prior case involving the same parties which spoke to the same issues then currently before it. The appellate court stated:

"The District Court in the present case stated that the *Bristol [Corp. v. United States,* No. CV–78–FW (C.D.Cal. May 22, 1980)] interlocutory opinion should not be given preclusive effect because '[a]s an interlocutory order it is subject to free revision by the court on its own motion or on motion of any party at any time before judgment.' Furthermore, although the *Bristol* opinion does not appear to be tentative, it could not have been the subject of an appeal at the time the instant case was decided in the District Court. We are satisfied that the District Court acted well within its discretion in determining the *Bristol* memorandum was not sufficiently firm to give it collateral estoppel effect.

"Moreover, we are convinced that the Government did not have a 'full and fair opportunity to litigate' its claim because it could not appeal the interlocutory memorandum in *Bristol.* Thus, we conclude that the District Court did not abuse its discretion in rejecting the application of the doctrine of collateral estoppel against the government on the issue."

707 F.2d at 1040. Likewise, the Court's interlocutory resolution of the Eleventh Amendment issue in *WHA II* will not preclude its re-examination in the instant case.

■ The Court now turns to resolving the Eleventh Amendment issue. It is well settled that, absent an express waiver, the Eleventh Amendment permits only prospective relief and bars a judgment for past liabilities that must be satisfied from the State's general revenues. *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Essentially, this issue's determination in the present case hinges on whether the State's legal obligation to reimburse the plaintiff hospitals for services rendered arose upon the services' performance or upon Final Settlement.[2] If the

---

**1.** In its June 16, 1982 *Memorandum Of Law* issued in *WHA II,* this Court stated that it would entertain plaintiffs' motion for reconsideration of the Eleventh Amendment ruling.

**2.** Plaintiffs refuse to recognize the "rendering of services" as a possibility for the event triggering the imposition of a legal obligation. Rather, plaintiffs steadfastly maintain that the interim

former, the Eleventh Amendment bars plaintiffs' recovery because they would be seeking retroactive relief. However, if the latter, that is, the legal obligation accrued upon Final Settlement, the Eleventh Amendment does not bar plaintiffs' recovery. The Final Settlement is presently unperformed. Thus if this were the pertinent event, the requested relief is prospective.

The Court is aware of no, nor have the parties offered any, precedent controlling the resolution of this issue. Plaintiffs cite various cases holding that in circumstances similar to the present, the statute of limitations commence running upon the Final Settlement (sometimes referred to as the "final adjustment" or "final audit") for a cause of action to recover excess interim type payments. *United States v. Withrow*, 593 F.2d 802 (7th Cir.1979); *United States v. Hughes House Nursing Home, Inc.*, 710 F.2d 891 (1st Cir.1983); *United States v. Pisani*, 646 F.2d 83, 89 (3rd Cir. 1981); *United States v. Gravette Manor Homes, Inc.*, 642 F.2d 231 (8th Cir.1981); *United States v. Whitehouse Nursing Home, Inc.*, 484 F.Supp. 29 (M.D.Fla.1979); *United States v. Graham*, 471 F.Supp. 123 (S.D.Tex.1979); *United States v. Normandy House Nursing Home, Inc.*, 428 F.Supp. 421 (D.Mass.1977); *United States v. Gottlieb*, 424 F.Supp. 417 (S.D.Fla.1976). The policy underlying these holdings is that it would be unfair to commence running the statute of limitations on the government's cause of action to recover excess interim payments before the government becomes aware of its cause of action pursuant to the Final Settlement. There is no like policy involved in the present Eleventh Amendment issue. The Court's focus is not on whether a cause of action has been unveiled. Rather, the Court focuses on whether plaintiffs' requested relief concerns the State's obligations incurred prior to this lawsuit's commencement or whether the requested relief concerns enjoining future State action in the Final Settlement process. Fairness considerations concerning knowledge of the precise obligation are lacking.

The Court is more conceptually at ease with the notion that the State's legal obligation to pay for the services rendered by the plaintiff hospitals accrued upon the rendering of these services. The method for calculating the precise legal obligation existed prior to the period in which the services were performed. Tr. at 78, 176. This method is used at Final Settlement to transform this undetermined legal obligation into a concrete monetary amount due and owing. For the Court to now order the State to alter its method of ascertaining its previously incurred legal obligation would afford plaintiffs retroactive relief barred by the Eleventh Amendment. The legal obligation's incurrence is the pertinent event for Eleventh Amendment purposes; not its subsequent transformation into a finite pecuniary sum.

However, "not every award of retroactive relief payable from a state treasury violates the Eleventh Amendment." *Daubert v. Percy*, 713 F.2d 328, 329–30 (7th Cir.1983). *Daubert* concerned a situation where the district court issued a permanent injunction in 1973 against the Wisconsin Secretary of DHSS ordering him and his successors in office to make certain welfare payments. Seven years later, in 1980, the district court amended the injunction so that the Secretary could refuse to make some of the payments required by the 1973 judgment. Plaintiffs then appealed that decision. However, while the appeal was pending, approximately five months after

payments made by the State to the hospitals embodies the "rendering of services" notion. Consequently, plaintiffs assert that the Court should view the defendants' position to be that the "interim payments" are the relevant event, contrary to the defendants' articulation of their position that the "rendering of services" is the relevant event. The Court finds plaintiffs' characterization self-serving since the interim payments are established for cash flow purposes only and have no legal effect. *See United States v. Withrow*, 593 F.2d 802 (7th Cir.1979). Furthermore, common sense dictates that it is more reasonable to find the event triggering the legal duty to pay for services rendered to be the actual rendering of the services rather than the payment of interim sums pending ultimate determination of the amount owed.

the district court amended the 1973 injunction the Wisconsin legislature amended the statute that underlay the original 1973 judgment, rendering that judgment unsound. On appeal, the Seventh Circuit reversed the district court's amendment of the 1973 injunction, but because of the change in the statute the original injunction was not reinstated.

On remand, the district court ordered the DHSS to pay the benefits that the State would have been required to pay during the five-month period between the time of the district court's amendment of the injunction and the legislative change in the statute underlying the original 1973 judgment. The DHSS challenged this ruling on appeal arguing that it violated the Eleventh Amendment. The Seventh Circuit affirmed the district court, finding as follows:

> The funds which defendants oppose paying are not compensation for loss prior to the entry of the 1973 injunction. They are funds which were required to be paid by that prospective injunction but were withheld because the injunction was erroneously modified in October 1980. Absent the erroneous modification and consistently with the Eleventh Amendment, defendants would have provided the benefits until the April 1, 1981, Wisconsin legislative change. The 1973 injunction was admittedly permissible under the Eleventh Amendment. That Amendment does not bar the [district court's] September 1982 order at issue because it was only effectuating the prior injunction during the brief period before the Wisconsin legislature acted.

713 F.2d at 330.

■ In the present case, on January 11, 1983, this Court enjoined the defendants from implementing and enforcing the freeze. The Court finds that the Eleventh Amendment bars plaintiffs' recovery only as to the period July 1, 1982 through January 11, 1983—the date of the Court's *Decision And Order* granting plaintiffs their

requested relief. Regarding the period January 12, 1983 through June 30, 1983, the Court finds, based on *Daubert, supra,* that the Eleventh Amendment does not preclude plaintiffs from obtaining monetary relief for funds unpaid because of the freeze. If the Seventh Circuit had upheld this Court's January 11, 1983 *Decision And Order,* such relief would have been prospective and, therefore, not barred by the Eleventh Amendment. *See Daubert,* 713 F.2d at 329 ("the possibility that a court of appeals might reverse a district court ... is not so slight that it is unfair to require that states make allowance for it— i.e., by setting aside pending appeal a reserve of funds in an escrow account.").

The Court recognizes that this ruling will not afford the plaintiffs any relief in the present case since the freeze legislation only affected the period July 1, 1982 through September 30, 1982. Reimbursement for the period October 1, 1982 through June 30, 1983 was based on the reimbursement rates previously established for the period July 1, 1982 through June 30, 1983. Since the freeze affected a period prior to January 11, 1983, any relief pertaining to such period would be retroactive and, therefore, barred by the Eleventh Amendment.

## II. Whether The State Failed To Comply With Procedures Required By Applicable Federal Regulations.

Provided reimbursement can only be paid in accordance with a State Plan for Medical Assistance running between the federal government and each state participating in the Medicaid program. 42 U.S.C. § 1396 and 1396a(a)(13). Regulations to implement this general requirement and provide due process safeguards have been adopted by the USDHHS Health Care Financing Administration ("HCFA").[3] Included among these regulations is 45 C.F.R. § 205.5(a) requiring that if a state makes a "material change in any phase of State law

---

**3.** Discussion of these regulations refers to those regulations in effect at the time of the freeze legislation's enactment.

...", it must amend the State Plan. The Secretary or the Secretary's designee must approve a State Plan amendment for it to be effective. 45 C.F.R. § 201.3.

Further, "in making significant changes in its methods and standards for determining payment rates", a state must make various assurances and findings satisfactory to the Secretary. 42 C.F.R. § 447.252. Included therein is the assurance that the State has complied with the 42 C.F.R. § 447.254 public notice requirement.

Neither prior to nor since the freeze legislation have the defendants amended the State Plan, submitted findings or assurances acceptable to the Secretary or sought the Secretary's approval. Nor has there been public notice or opportunity for public comment regarding the freeze legislation. Finally, the Secretary has not had the opportunity to determine whether the freeze complies with federal law.

Plaintiffs argue that these failures render the freeze legislation void. Simply put, plaintiffs' position is that since the freeze legislation constituted both a "material change" in state law and a "significant change" in the State's methods and standards for determining payment rates, the State was obliged to follow the aforementioned procedures. Consequently, the State's failure to follow these procedures, plaintiffs contend, voids the freeze legislation and 42 C.F.R. § 447.256(b) precludes its resurrection by submitting belated assurances since the freeze was for a finite period of time. Defendants deny that the freeze legislation possesses these "material" and "significant" characteristics. Rather, defendants contend that because the freeze did not change the methods or standards for determining hospital rates, it only delayed their implementation for three months, there was no material or significant change requiring adherence to the previously stated federal regulatory procedures.

The federal regulations do not define the terms "significant" or "material" as used in the present context. Resultingly, in reaching its decision, the Court relies on the testimony and evidence presented at trial.

The Court finds that the freeze constituted both a "material change" in State law and a "significant change" in the methods and standards used for determining the rate for Medicaid reimbursement. In determining the materiality and significance of the freeze, the Court focuses on the freeze's impact upon the provider hospitals.

David A. Hagemeier, Vice-President of Finance for the Wisconsin Hospital Association, conducted a study regarding the freeze's financial impact on provider hospitals. The data for the study derived from information contained in interim rate notification letters prepared by the State. Tr. at 103. The study compared the interim rates for 1981–82, the year preceding the freeze, with the interim rates for 1982–83, the year of the freeze. Tr. at 104. Mr. Hagemeier's study found that the freeze would have reduced Medicaid interim rates for inpatient services by approximately $2.136 million or 1.773% compared to what would have otherwise been paid under the State Plan. Tr. at 106.

Karl Rajani, Chief of the Institutional Rate-Setting and Audit Section for DHSS when the Wisconsin legislature adopted the freeze, testified at trial regarding the freeze's impact on interim rates for out-patient hospital services. He determined the impact to be a 2% reduction on an annual basis or an 8% reduction for the three months in which the freeze would be in effect. Tr. at 42–43.

Plaintiffs also presented the testimony of George J. Quinn, a certified public accountant with the accounting firm of Ernst and Whinney whose specialty is the health care industry. Mr. Quinn testified that the State Plan's method for recognizing the impact of inflation and intensity [4] provided

---

4. Intensity refers to the increased costs incurred by hospitals because of changing technology and improvements in medical practice.

for an increase in the reimbursement rate of approximately 8% for the period July 1, 1982 through June 30, 1983. Tr. at 122. This rate was approximately 2.6% less than the actual rate of inflation and intensity for hospitals during this same period using figures established by the Federal Bureau of Labor Statistics. Tr. at 116. Mr. Quinn stated that the reason for the difference was because the State Plan did not recognize the "actual" figures. Tr. at 122.

■ The Court finds that the State Plan's failure to account for the actual increases in the rate of inflation and intensity when coupled with the freeze's reduction of the reimbursement rate for both inpatient (1.773%) and outpatient (2%) services, renders the freeze a "material change" in State law and a "significant change" in the methods and standards for determining the rate for Medicaid reimbursement. Accordingly, the State was required to follow the procedures outlined in the applicable federal regulations. Both parties agree that, pursuant to 42 C.F.R. § 447.256(b)(2), the State had until September 30, 1982, to submit assurances to the Secretary, if such submission was necessary. Since the Court finds that such submission was necessary, the State's failure to follow the regulatory procedures in enacting and implementing the freeze legislation voids this legislation.

**III. Whether The Freeze Violated The WHA II Stipulation And Unconstitutionally Impaired The Provider Agreements.**

■ The Court will consider together the unconstitutional impairment of contract issue and the issue regarding whether the freeze violates the Stipulation resolving *WHA II* ("the Stipulation"). The plaintiff hospitals have "provider agreements" with DHSS which incorporate both the State Plan and the Stipulation. The Stipulation modified the State Plan and provided that no further changes could be made without amending the State Plan. Plaintiffs contend that the State violated the Stipulation by adopting the freeze legislation without amending the State Plan, thereby precluding the opportunity for approval by the Secretary of USDHHS and plaintiffs' right to be heard before the Secretary. Plaintiffs argue that the State action also violated Article I, Section 10 of the United States Constitution, which provides:

No state shall enter into any treaty, alliance, or confederation; grant letters of marque and reprisal; coin money; emit bills of credit; make anything but gold and silver coin a tender in payment of debt; pass any bill of attainder, ex post facto law, or law impairing the obligation of contract, or grant any title of nobility.

Defendants only response to these issues is that because the freeze legislation was adopted before the Stipulation was executed, it was thereby incorporated into the Stipulation. The provider agreements provided, *inter alia,* that "[t]he provider shall comply with all ... State laws pertinent to Wisconsin's Medical Assistance Program."

Resolution of this issue turns on whether the Court finds that the freeze legislation was incorporated into the Stipulation. In its *Decision And Order* of January 11, 1983, in this same case, the Court resolved this issue articulating its reasoning in substantial detail. The Court stated:

Defendants assert that since plaintiffs accepted the benefits of the new State Plan, they should now be estopped from challenging the constitutionality of section 2033(5). The Court concludes that the argument is without merit. The Court reaches this conclusion because of the chronology of the settlement negotiations which led to the resolution of *WHA II* and an amended State Plan.

Defendants correctly point out in support of their estoppel argument that section 2033(5) took effect May 1, 1982, and that attorneys for the plaintiffs and the state defendants did not sign the amended stipulation until June 29, 1982. The Court did not enter the order of dismissal until July 21, 1982. Thus, at first blush, it would appear that plaintiffs accepted the benefits of the new State Plan with full knowledge of the freeze and so

should not now be heard to complain. However, the dates cited by defendants do not tell the full story.

As early as August 1981, attorneys for WHA and the State had signed a stipulation "subject to the approval of the parties named...." This early document makes no reference to a possible freeze. A final stipulation was signed by attorneys for the State and WHA on February 24, 1982, which provided for an effective date of April 1, 1981.

In accordance with the settlement, the state filed amendments to the State Plan with the federal government on March 30, 1982. This clearly demonstrates that the State believed the matter had been settled before the concept of a freeze was ever introduced into the Legislature. It was only a dispute raised by the federal defendants in *WHA II* concerning whether the effective date of the amended State Plan should be January 1, 1982, or April 1, 1981 (to which the state defendants and WHA had agreed), which delayed final resolution of the suit until July 21, 1982.

During a conference call between the Court and the parties on April 2, 1982, the Court agreed to resolve the issue of the effective date. The existence of an agreement was also memorialized in a letter by the attorney for the State on April 15, 1982: As I indicated during the April 2, 1982 conference call, the State defendants and the Wisconsin Hospital Association *have reached an agreement with regard to Wisconsin's Medicaid Hospital Reimbursement System.* An amendment to the current State Plan reflecting that agreement was submitted to the Federal defendants on March 31, 1982 (sic). Approval of said amendment is expected forthwith. Thus, *the sole remaining issue* in this proceeding is when the amendment to the current State Plan which was submitted on March 31, 1982 (sic), can become effective. The Federal defendants' position is that the earliest effective date is January 1, 1982, the first date of the calendar quarter in which the amendment was submitted. The Wisconsin Hospital Association's position is that the amendment may be effective as of April 1, 1981.

(Emphasis added; Joint Affidavit, Exhibit H).

It is undisputed by the defendants that the first time the notion of Medicaid freeze was introduced into the Wisconsin Legislature was April 15, 1982. On that date a six month freeze was proposed and rejected in the Assembly. (Supplemental Affidavit of Richard J. Lewandowski, Exhibits A and B). On April 23, 1982, a Committee Conference report containing a three month freeze on Medicaid reimbursement was adopted by the Assembly and concurred in by the Senate. Section 2033(5) of Chapter 317 was published in the official state newspaper on April 30, 1982.

Thus, it is clear that while no mention of a Medicaid freeze was ever made until April 15, 1982, the State and WHA had reached an agreement, which provided increased benefits to the hospitals under the amended State Plan well before April 15. That agreement was signed on February 24, 1982.

The only subsequent change in the June 29, 1982 Amended Stipulation related to the effective date. Defendants cite the Fifth Circuit's definition of estoppel in *Kaneb Services v. Federal Sav. & Loan Ins.*, 650 F.2d 78, 81 (5th Cir.1981): "It is recognized that under the doctrine of equitable estoppel a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, statute, regulation, or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects." It is clear to the Court that when plaintiffs accepted the benefits of the amended State Plan on February 24, 1982, their "full knowledge" could not have included knowledge of the upcoming freeze. Thus it cannot be said that they are now taking an inconsistent position. They expect only the benefits they bargained for when they reached a meet-

ing of the minds with the State defendants on February 24, 1982. A three month freeze was not a corresponding obligation on February 24, 1982.

Similarly, the Court can find no detrimental reliance on the part of the defendants. "In the absence of reliance, there is no basis for equitable estoppel." *Ewald v. Great Atlantic & Pac. Tea Co., Inc.* 620 F.2d 1183, 1188 (6th Cir.1980). When the State agreed to the amendments to the state Medicaid plan, it was not relying on WHA's acquiesence in a three month rate freeze. No such freeze had been proposed. The State's entry into the Amended Stipulation was not induced by the hospitals' acceptance of a three month rate freeze. Because an agreement on the amended State Plan had clearly been reached, if not signed in final form, prior to the implementation of the freeze, the Court does not find that equity requires that plaintiffs be estopped from challenging that freeze.

While the chronology of the settlement negotiations which led to the Amended Stipulation in *WHA II* would be sufficient to convince the Court that defendants' estoppel argument is without merit, there is one additional factor which is significant. In negotiating the language of the final stipulation, WHA proposed the following on September 16, 1981:

> This stipulation shall not preclude the right of Defendants to amend the State Plan for Medical Assistance to accommodate subsequent other changes in federal law or regulations ... (Joint Affidavit, Exhibit B.)

The state responded by proposing this language:

> This stipulation shall not preclude the right of Defendants to amend the State Plan for Medical Assistance to accommodate subsequent substantial changes in circumstances such as changes in federal or *state law regulations* and the right of Plaintiffs to contest any such amendments. (Emphasis added.) (Joint Affidavit, Exhibit C.)

WHA rejected the State's proposal. In both the final stipulation to amend the State Plan signed by the State and WHA on February 24, 1982 and in the subsequent Amended Stipulation signed on June 29, 1982, the State's requested language on subsequent changes in state law or regulations does not appear. Instead the language is:

> These provisions shall not preclude the right of Defendants to amend the State Plan for Medical Assistance, or the right of the Plaintiffs to request an amendment to such Plan, at a subsequent date to *accommodate changes in federal law* or regulation or substantial changes in circumstances, and the right of Plaintiffs to contest any such amendments. (Emphasis added. Joint Affidavit, Exhibit D, § 1(h) and Exhibit J, § 1(h).)

Thus, plaintiffs were explicit in rejecting any acquiesence in a change in the amended State Plan brought about by changes in state law. Plaintiffs specifically informed the State that any such amendments might be contested. The Court can find no waiver by plaintiffs of their right to challenge the Medicaid freeze. Once again, although the stipulation which ultimately ended *WHA II* was not signed until June 29, 1982, this language appears in the stipulation signed by the State and WHA on February 24, 1982. Aside from the effective date of the plan (an issue which was raised by the federal defendants), the agreement reached by WHA and the State on February 24, 1982 remained unchanged on June 29, 1982.

*Decision And Order* at 13–18 (January 11, 1983). Having been presented with no new information regarding a change in the circumstances, the Court will adhere to its prior ruling. Accordingly, the Court finds that the freeze violated the Stipulation and therefore also violated U.S. Const. Art. I § 10.

## CONCLUSION

The Court finds that in enacting 1981 Wis. Laws Ch. 317, § 2033(5), Wisconsin

violated applicable federal regulations and further violated the terms of the Stipulation resolving *WHA II.* This violation of the Stipulation in turn resulted in a breach of the provider agreements which the Court finds to violate U.S. Const. art. I § 10. However, the Eleventh Amendment bars plaintiffs' recovery for unpaid funds because of the freeze for the period July 1, 1982 through January 11, 1983. Since the freeze pertained to the period July 1, 1982 through September 30, 1982, the Eleventh Amendment precludes the plaintiffs from obtaining any relief in this action.