The HILLHAVEN
CORPORATION, Plaintiff,

v.

The WISCONSIN DEPARTMENT OF
HEALTH AND SOCIAL SERVICES,
et al., Defendants.

No. 83–C–0016.

United States District Court,
E.D. Wisconsin.

May 7, 1986.

Ralph J. Ehlinger, Meissner, Tierney, Ehlinger & Whipp, Milwaukee, Wis., Malcolm J. Harkins, III, Casson, Calligaro & Mutryn, Washington, D.C., for plaintiff.

F. Thomas Creeron, III, Asst. Atty. Gen., Madison, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

The plaintiff has filed a motion for summary judgment and, in the alternative, for a preliminary injunction, seeking to invalidate a Wisconsin statute governing Medicaid reimbursement rates. The statute in question has effectively frozen the capital allowance aspect of the rate paid to the plaintiff under the Wisconsin Medicaid Plan as compensation for the provision of nursing home facilities and services. The matter has been fully briefed, and oral arguments were heard on December 13, 1985. Having considered the written briefs, the points raised at oral argument, and the other materials that constitute the record in this action, the Court will grant the plaintiff's motion for summary judgment.

## I. REGULATORY BACKGROUND

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq., ("The Medicaid Act"), establishes a cooperative state and federal medical assistance program commonly known as Medicaid. The Medicaid program allows states which elect to participate to receive federal funding which, in combination with state funds, is used to reimburse providers of medical and health care services. A participating state must devise a reimbursement plan that conforms to federal standards and submit the plan to the Secretary of the Federal Department of Health and Human Services ("DHHS") for approval. Wisconsin has elected to participate in the Medicaid program, and its reimbursement plan was submitted to and approved by the Secretary of DHHS.

The federal standard for state reimbursement plans is set forth in 42 U.S.C. § 1396a(a)(13)(A) (1985) and its corresponding regulations, 42 C.F.R. § 447.250(a) (1985). That standard, which has been in effect since 1980, requires that reimbursement rates be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A). The previous standard, which was in effect from 1972 to 1980, required reimbursement "on a reasonable cost related basis." 42 U.S.C. § 1396a(a)(13)(E) (1976).

The Wisconsin Medicaid Plan provides for adjustment of reimbursement rates for nursing home facilities at least once a year at the beginning of the calendar year. Wisconsin State Plan §§ 6.0100, 6.0400. The adjustment for nursing homes is based on inflation forecasts derived from the Consumer Price Index. In calendar year 1981, the Wisconsin Medicaid Plan by means of the "Methods of Implementation for the 1981 Nursing Home Reimbursement Formula for Skilled Nursing Facilities and Intermediate Care Facilities" (the "1981 Methods of Implementation"), also provided for an adjustment of reimbursement rates for individual nursing homes in the event of a change of ownership. The 1981 Methods of Implementation provided that the new owner of a nursing home covered under the plan may request, or the Wisconsin Department of Health and Social Services (DHSS) may require, that new reimbursement rates be established based on historical cost data from at least a six-month period of the new owner's operation. According to the 1981 Methods of Implementation, the historical cost data should include both interest expense and return on owner's equity components which reflect the cost to the current owner of acquiring the nursing home facility. On the other hand, depreciation expense remained based on the original cost of the facility. (Affidavit of Robert Schimmel, Plaintiff's Exhibit B, p. 2–3).

Wisconsin's 1982 Methods of Implementation, which governed reimbursement rates for the period January 1, 1982, through December 31, 1982, provided that a modified percentage increase would be

applied to the base rates determined under the 1981 Methods of Implementation. The formula used to determine capital allowance adjustments for changes in ownership under the 1981 Methods of Implementation were also to be applied under the 1982 Methods for any facilities acquired on or before December 31, 1982. As in 1981, the 1982 Methods of Implementation provided that any capital allowance adjustments would not be effective until at least six months after the change of ownership. A similar provision regarding capital allowance adjustments was incorporated into the January 1, 1983 through June 30, 1983 Methods of Implementation with respect to facilities acquired on or before December 31, 1982.

In April, 1982, the Wisconsin legislature enacted a provision which would maintain reimbursement rates at their 1982 level for the first three months of 1983. Chapter 317, Laws of 1981, § 2033(5). This three-month "freeze" was intended as a means of reducing the state's budgetary problems. The Wisconsin legislature enacted the three-month freeze after alternative measures, including proposals for six month delays in rate increases, had been considered and rejected.

In March, 1983, the Joint Finance Committee of the Wisconsin State Legislature considered and took final action on the question or reimbursement rates to be used for nursing home facilities in the first two quarters of 1983. Due to certain orders of this Court (discussed below) which invalidated the three-month rate freeze, the Joint Committee authorized rate increases in the period January 1, 1983 through June 30, 1983 on a sliding scale between 2.25 and 4 percent, depending upon the economic efficiency of the provider's facility. This rate freeze was intended to compensate providers only for the impact of inflation and not increased capital costs. (Schwoegler Aff. ¶ 3, Plaintiff's Ex. G). This "six month formula" provided that any and all of the rate increase for the first quarter of 1983 and any capital adjustment resulting from a change of ownership recognized during the first six months of 1983 were subject to

recoupment based upon the outcome of this litigation.

## II. PROCEDURAL BACKGROUND

The plaintiff, Hillhaven Corporation, is a Tennessee corporation which owns and operates fourteen nursing home facilities in Wisconsin. Twelve of these facilities were acquired on September 1, 1982, from National Health Enterprises ("NHE"). Each of the plaintiff's nursing homes is qualified as a provider of services to Medicaid beneficiaries under the Wisconsin Medicaid Plan, and each is under contract with the state to provide such services.

Defendant Wisconsin Department of Health and Social Services is designated as the state agency responsible for the administration of Wisconsin's Medicaid Plan pursuant to a contract with the United States Government known as the Wisconsin State Medicaid Plan. Defendant Linda Reivitz is the Secretary of the Wisconsin DHSS, and is responsible for the administration of the state plan. Defendant Charles P. Smith is Treasurer of the State of Wisconsin and is responsible for payment of the funds constituting reimbursement to providers under the state plan.

The plaintiff commenced this action on January 7, 1983, by filing a summons and complaint along with motions for a temporary restraining order and a preliminary injunction. The essence of the plaintiff's claims was that the three-month freeze in reimbursement rates was illegally imposed and that it unlawfully deprived the plaintiff of its right to have the capital allowances adjusted for the nursing homes it purchased on September 1, 1982. In counts one and two of the complaint, the plaintiff sought declaratory and injunctive relief, asserting that Chapter 317, § 2033(5), Laws of 1981, was a violation of federal law and therefore unconstitutional under the Supremacy Clause, U.S. Const. Art. VI, cl. 2. Similar relief was sought in the five additional counts.

On March 23, 1983, this Court granted the plaintiff's motion for a preliminary in-

junction, thereby enjoining the state from implementing and enforcing the rate freeze authorized under § 2033(5). Among the findings of fact set forth in that order were the following:

12. Defendants undertook no analysis and made no findings regarding the effect of the rate freeze on the reasonableness or adequacy of rates for efficiently and economically operated Medicaid providers prior to the enactment of this provision. Likewise, defendants undertook no analysis of projected economic conditions with respect to Medicaid providers prior to the enactment of this provision.

14. On January 11, 1983, this Court rendered a decision in *Wisconsin Hospital Association, et al. v. Reivitz*, No. 82–C–1055 (E.D. Wis. Jan. 11, 1983). In that case, a hospital association and several individual hospitals challenged the constitutionality of section 2033(5) which imposed the rate freeze. This Court found the statute to be unconstitutional, reasoning that a rate imposed without considering the impact of inflation or other economic factors is arbitrary and, therefore, in violation of 42 U.S.C. § 1396a(a)(13)(A) which requires that rates be "reasonable and adequate." The Court found that since the state statute conflicted with the federal statute, that the former was void as a result of the Supremacy Clause.

*Hillhaven Corporation v. Wisconsin Dept. of Social Services, et al.,* No. 83–C–16, p. 5 (E.D.Wis. March 22, 1983). Based on the Court's decision in *Reivitz,* the Court found that the plaintiff in this action was reasonably likely to succeed on the merits of its claims. *Id.* at 6. The Court also found that the plaintiff lacked an adequate remedy at law due to the state's immunity under the Eleventh Amendment from suits in federal court for retroactive monetary damages. *Id.*

On May 8, 1984, in separate decisions, the Court of Appeals for the Seventh Circuit reversed and remanded this Court's decision in *Reivitz, Wisconsin Hospital Assoc. v. Reivitz,* 733 F.2d 1226 (7th Cir.1984), and vacated the preliminary injunction in this case, *Hillhaven Corp. v. Wisconsin Dept. of Health & Social Services,* 733 F.2d 1224 (7th Cir.1984). With respect to this case, the Court of Appeals remanded the action for reconsideration of whether the plaintiff had demonstrated a likelihood of success on the merits, 733 F.2d at 1226. As noted above, this Court's finding on that question was based in large part on its decision in *Reivitz* which, when reversed by the Court of Appeals, no longer provided the firm foundation it once had. *Id.*

On November 1, 1985, the plaintiff filed its motion for summary judgment along with its alternative request for a preliminary injunction. Since the decision in this case depended in large part upon the outcome of *Reivitz,* which was before the Court on remand, the Court has withheld its ruling until that case was resolved. The latest decision in *Reivitz* was issued on March 18, 1986; the relevant findings and conclusions of that case will be discussed below as they pertain to this action.

## III. ISSUES

The following issues have been raised with respect to the plaintiff's motion for summary judgment: (1) whether the three-month rate freeze was imposed illegally in violation of the Medicaid Act and its implementing regulations; (2) whether the defendant's refusal to adjust the plaintiff's capital allowance to reflect the cost of purchasing its nursing homes, while allowing capital allowance adjustments for similarly situated providers, violates the Equal Protection Clause of the Fourteenth Amendment; (3) whether the relief sought by the plaintiff is barred by the Eleventh Amendment; and (4) whether the plaintiff has standing to maintain this action.

The first two issues have been raised by the plaintiff which claims that, but for the three-month freeze, it should have received a capital allowance adjustment on March 1, 1983 for the facilities it purchased on September 1, 1982. The latter two issues are affirmative defenses asserted by the de-

fendants. These issues will be discussed seriatim.

## IV. THE THREE–MONTH FREEZE WAS IMPOSED IN VIOLATION OF FEDERAL PROCEDURAL REQUIREMENTS

### A. The State Failed to Submit Required Findings, Assurances, and Additional Information.

Under the Medicaid Act, nursing homes must be paid rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards ..." 42 U.S.C. § 1396a(a)(13)(A) (1985). In order to ensure compliance with these criteria, the federal regulations implementing § 1396a(a)(13)(A) specified, at the time the freeze was enacted,[1] that the following prerequisites must be satisfied prior to the implementation of a Medicaid payment rate:

(1) the state must make findings that the rate is reasonable and adequate to meet the standard set forth in 42 U.S.C. § 1396a(a)(13)(A). 42 C.F.R. § 447.252(b) (1982);

(2) the state, in making "significant changes in its methods and standards for determining payment rates", must provide assurances to the Secretary of DHHS that the rate meets the standard set forth in 42 U.S.C. § 1396a(a)(13)(A). 42 C.F.R. § 447.-252(c) (1982); and

(3) the rate must in fact be reasonable and adequate within the meaning of the statute. 42 C.F.R. § 447.252(a) (1982).

It should be emphasized that the assurances required under § 447.252(a) only apply to situations where the rate change is significant; no such criterion exists with respect to the findings required under § 447.252(b). *See Wisconsin Hospital Assn. v. Reivitz,* 733 F.2d 1226, 1234 (7th Cir.1984). In addition to the specified findings and assurances, 42 C.F.R. § 255(b) requires that the state agency responsible for the administration of the Medicaid program submit "detailed information concerning the impact of any changes on different types of services" when Medicaid payment methods are altered. *Reivitz,* 733 F.2d at 1226.

As stated above, this Court found in its order granting the plaintiff's motion for a preliminary injunction that the defendants did not make the required findings with respect to the three-month freeze prior to its enactment. Likewise, the Court found that the defendants failed to provide the detailed information required under 42 C.F.R. § 255(b). The Court's findings in this regard remain valid,[2] as the defendants have not submitted contradictory evidence with respect to the three-month freeze. The defendants have submitted evidence that findings were made with respect to the six-month formula, but the validity of the six-month formula is not at issue here.

There is also no dispute that the DHSS failed to submit any assurances to the Sec-

---

**1.** Subsequent to the commencement of this action, the federal regulations were amended so that the particular assurances and findings which must be submitted are now set forth in 42 C.F.R. § 253(a) and (b), respectively.

**2.** Evidence submitted by the plaintiff in support of the present motion establishes that no findings, assurances, or other information was submitted by the state with respect to the three-month freeze. The affidavit of Karl Rajani, formerly the chief of the Institutional Rate-Setting and Audit Section of DHSS, reads in part as follows:

8. "... no findings were ever made by the State of Wisconsin that the freeze produced a rate which was reasonable and adequate as defined by the Medicaid Act. The State did not provide during my tenure assurances to the federal Department of Health and Human Services that the rate or payment methodology complied with the requirements of federal law. Likewise, the State neither prepared nor submitted to the federal Department of Health and Human Services any additional information or data regarding the impact of the rate freeze."
Plaintiff's Ex. C, ¶ 8.

retary of DHSS with respect to the three-month freeze, although such assurances would have been required only if the rate freeze constituted a significant change in the payment methodology. The term "significant" has not been defined in the pertinent federal regulations after 1981.[3] However, the Court did find in its latest decision in the *Reivitz* case that the three-month freeze constituted a significant change in Medicaid rates paid to qualified Wisconsin hospitals. *Wisconsin Hospital Assn. v. Reivitz*, 630 F.Supp. 1015, 1022 (E.D.Wis.1986). That finding was based on certain studies which indicated that the freeze resulted in a 1.773% annual reduction in rates for inpatient services and in a 2% annual reduction in rates for outpatient hospital services. *Id.* at 1022. In view of those percentage reductions, along with the concomitant lack of any provision for an inflation adjustment, the Court concluded that the three-month freeze effected a significant change in the methods and standards for determining the reimbursement rates for covered hospitals. *Id.* at 1023.

■ The evidence submitted by the plaintiff in this case shows that the three-month freeze produced a significant change in the reimbursement methodology for nursing homes just as it had for covered hospitals. First, the freeze reduced reimbursement rates for nursing homes in excess of one percent, the previous benchmark for measuring whether a certain change in reimbursement methods was significant. (Rajani Affidavit, see footnote 2, *supra*). Second, the freeze provided that the 1982 rates be effective for a fifteen-month period, whereas the state plan and federal law required a redetermination of rates at least annually. (*Id.*). Third, the state plan required that any rate redetermination take into account economic trends and conditions that would prevail during the effective period of the new rates. No such analysis of economic indicators was conducted prior to the imposition of the freeze.

(*Id.*). For these reasons, the Court must conclude that the three-month freeze constituted a significant change in the Wisconsin reimbursement methods which required that assurances be submitted to the DHHS.

■ The failure to provide the requisite findings, assurances, and additional information set forth in 42 C.F.R. § 442.255(b) with respect to the modification of reimbursement rates under a state Medicaid plan renders invalid those modified rates and the state statute under which they were established. *Edgewater Nursing Center, Inc. v. Miller*, 678 F.2d 716 (7th Cir.1982); *Nebraska Health Care Association, Inc. v. Dunning*, 778 F.2d 1291, 1294 (8th Cir.1985); *Washington State Health Facilities Assn. v. State of Washington Dept. of Social and Health Services*, 698 F.2d 964, 965 (9th Cir.1982); *Forbes Health Systems v. Harris*, 661 F.2d 282, 286 (3d Cir.1981). Accordingly, § 2033(5) and the rate freeze imposed thereunder are invalid and the defendants are enjoined from enforcing those provisions.

## B. The Rate Freeze Was Imposed By The State Legislature Based Strictly on Budgetary Concerns.

The plaintiff contends that the rate freeze is invalid because the legislature enacted it due solely to fiscal concerns. The plaintiff also contends that the freeze is invalid because it was imposed by the state legislature, as opposed to the "single state agency" charged with the administration of the state plan. 42 U.S.C. § 1396a(a)(5).

■ With respect to the second argument, the plaintiff has cited no authority for the proposition that a state legislature may not pass laws affecting the state's Medicaid reimbursement rates as long as the rates established otherwise comply with federal law. Section 1396(a)(5) provides that a single state agency be created

---

**3.** In *Reivitz,* the Seventh Circuit observed that the federal regulations formerly defined a "significant" change as one which "is expected to increase or decrease Medicaid payments for [a particular] service by one percent or more during the 12 months following the effective date of the change." 733 F.2d at 1235, *quoting* 42 C.F.R. § 447.205(a) (1981).

to administer the state's plan; however, that section does not specify that the state agency so created shall have sole authority to determine the reimbursement rates paid to providers. The term "administration" as it is used in § 1396a(a)(5) does not convey such broad implications.

The plaintiff's first argument is far more meritorious. While budgetary limitations may be considered in setting reimbursement rates, "states still cannot develop their plans 'solely on the basis of budgetary appropriations.'" *Reivitz*, 733 F.2d at 1235, *quoting* H.R.Conf.Rep. No. 1479, 96th Cong., 2d Sess. 154, *reprinted in* 1980 U.S.Code Cong. & Ad.News 5526, 5944. Nor are budgetary concerns a proper basis upon which to disregard the mandate in § 1396a(a)(13)(A) that reimbursement rates be "reasonable and adequate." *Reivitz*, 733 F.2d at 1235.

In her affidavit, Diane Harder, legislative fiscal analyst with the Wisconsin Legislative Fiscal Bureau, states that "[a]t the time fiscal estimates were being prepared for the legislature in connection with proposals for Senate Bill 783 (enacted as Chapter 317, Laws of 1981), it was apparent that, due to a downturn in economic conditions, significant budget reductions, tax increases, or both would be required." (Plaintiff's Ex. D, p. 5). The three-month freeze was such a budget reduction. (Affidavit of Lon Sprecher, Plaintiff's Ex. F). The defendants concede that the freeze was passed "partially in response to budgetary difficulties," (Defendant's Brief, p. 13), but argue that the limited duration of the freeze indicates that the legislature was aware of the restrictions imposed upon it in that respect by federal law.

The defendants' argument is not persuasive. The length of the freeze would appear to be a pertinent consideration only if the state had undertaken a study prior to the enactment of the freeze which indicated that a three-month moratorium on rate increases would not affect the reasonableness and adequacy of the rates paid due to prevailing economic factors. A freeze imposed without such considerations having been made beforehand, whether it be for three months or longer, would result in reasonable and adequate reimbursement rates only by chance and not by design.

The evidence presented indicates nothing other than that the legislature passed § 2033(5) solely in response to fiscal problems the state was encountering at that time. As such, the three-month freeze violates the requirement implicit in § 1396a(a)(13)(A) that rates not be set arbitrarily. Thus, the three-month freeze is invalid for this reason in addition to those discussed earlier.

## V. THE DEFENDANTS' DENIAL OF A CAPITAL ALLOWANCE ADJUSTMENT FOR THE PLAINTIFF'S FACILITIES HAS DENIED THE PLAINTIFF EQUAL PROTECTION OF THE LAWS

The Fourteenth Amendment to the United States Constitution provides, in pertinent part, that "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." Corporations, such as the plaintiff, are "persons" entitled to equal protection of the laws under the Fourteenth Amendment. *Grosjean v. American Press Co.*, 297 U.S. 233, 244, 56 S.Ct. 444, 446, 80 L.Ed. 660 (1936).

The plaintiff's equal protection claim is based on the fact that every other provider which acquired an existing nursing home at or about the same time that the plaintiff completed its acquisitions received a capital allowance adjustment in accordance with the 1981 and 1982 Methods of Implementation. (Schimmel Affidavit, Plaintiff's Ex. B). The plaintiff did not receive such an adjustment and, since all Methods of Implementation for the periods after June 30, 1983 base a particular facility's capital cost reimbursement on its capital allowance as of June 30, 1983 (explained more fully below), the plaintiff has not received an appropriate adjustment since that time.

The defendants did not specifically address the plaintiff's equal protection argu-

ment in their brief or at oral argument. However, the defendants have consistently maintained that any capital cost adjustments allowed in the first three months of 1983 in connection with changes of ownership that occurred during the last six months of 1982 are subject to recoupment under the six-month formula. Presumably, the defendants believe that the prospect of recovering those capital cost increases from other providers places those providers in the same position as the plaintiff.

The Court agrees with the plaintiff's contention that the recoupment provision does not justify the dissimilar treatment accorded the plaintiff as opposed to other similarly situated providers. Even if the recoupment provision was enforced, the state would only recover the rate increases paid to the other providers for the first three months of 1983. The recoupment of funds from that period would not affect the capital allowance increases paid to those other providers in periods after June 30, 1983, which were based on their capital allowances as of that date. The state's decision to grant capital allowance increases to other providers, but not to the plaintiff, during the first quarter of 1983 resulted in their obtaining higher capital allowance rates as of June 30, 1983, which rates are still reflected in their current capital allowances. (See discussion under Part VI, *infra*.) In short, the capital allowance adjustments received by the other providers during the first quarter of 1983 have had a continuing effect on their reimbursement rates to date, an effect the recoupment provision would not reverse.

The defendants have submitted several affidavits in their attempt to explain why the plaintiff did not receive a capital allowance adjustment during the second quarter of 1983 after the freeze had ended. (See footnote 4, *infra*). The Court does not view that evidence as having any bearing on the reason for which the plaintiff was denied a capital allowance adjustment during the first quarter of 1983, while such an adjustment was made with respect to other similarly situated providers. The different treatment accorded the plaintiff under these circumstances denied it equal protection of the laws.

## VI. ELEVENTH AMENDMENT

The defendants contend that the plaintiff's claims are barred by the Eleventh Amendment for two reasons. First, the defendants assert that any order invalidating § 2033(5) and requiring a capital allowance adjustment as of March 1, 1983, for the facilities purchased by the plaintiff would be retrospective relief against the state which is prohibited by the Eleventh Amendment. Second, the defendants contend that the plaintiff's claim that it is entitled to capital allowance adjustments is, in effect, a request that this Court evaluate the defendants' application of the six-month formula. That, the defendants argue, is a question of state law which this Court is precluded from considering by the Eleventh Amendment.

### A. Requested Relief Is Not Entirely Retrospective In Nature.

The Eleventh Amendment to the United States Constitution provides as follows:

**Suits against states—Restriction of judicial power.**

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The United States Supreme Court has interpreted the Eleventh Amendment as barring suits in federal court against an unconsenting state brought by its own citizens as well as those brought by citizens of another state. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). The Supreme Court has also held that the Eleventh Amendment bars suits brought by private parties even if a state is not named as a defendant when the liability sought to be imposed would have to be paid from state funds. *Ford Motor Co. v. De-*

*partment of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945).

An exception to this general rule of states' immunity from suits exists where a suit challenges the constitutionality of a state official's acts in enforcing state law. *Ex Parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908). Under those circumstances, the case is not deemed to be against the state because an official who acts against the state in violation of the Constitution is "stripped of his official or representative character." 209 U.S. at 160, 28 S.Ct. at 454. The Supreme Court decided that such an exception was necessary in order to hold state officials responsible to the supreme authority of federal law. *Id.*

The exception announced in *Young* has not been expanded in subsequent cases, however. In a number of cases, beginning with *Edelman v. Jordan, supra,* the Supreme Court established a somewhat hazy line of demarcation between suits which sought prospective injunctive relief along the lines of *Young,* and those which sought retroactive monetary awards. The former type of action was permissible because it did not allow for a monetary award from current state funds to pay for past liabilities, as a suit seeking retroactive relief did. *Edelman,* 415 U.S. at 667–669, 94 S.Ct. at 1357–1358. Thus the Court held that when a plaintiff sues a state official for an alleged violation of federal law, a federal court may award injunctive relief which governs the future conduct of the state official, but not retroactive monetary damages. 415 U.S. at 678, 94 S.Ct. at 1363.

The holding of *Edelman* was reaffirmed and extended in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In addition to stating that the spirit of *Young* did not encompass retroactive relief, 104 S.Ct. at 911, the Supreme Court held in *Pennhurst* that a suit brought in federal court against a state official for the violation of a state law also was barred by the Eleventh Amendment. 104 S.Ct. at 911. The Court reasoned that the vindication of "the su-

preme authority of federal law" over state law was not at stake where the issue presented concerned only matters of state law and not federal statutes or constitutional principles. *Id.*

The Supreme Court's expansive reading of the Eleventh Amendment continued in *Green v. Mansour,* —— U.S. ——, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). The petitioners in *Green* had brought two separate actions claiming that the director of the Michigan Department of Social Services miscalculated the amount of benefits they were due under the Aid to Families With Dependent Children ("AFDC") program, in violation of federal law. Before either case could be resolved on its merits, Congress amended the relevant statutory provisions of the AFDC program so that the Michigan official's conduct thereafter conformed to federal law. 106 S.Ct. at 424–25. Due to the change in federal law, the district court dismissed as moot the claims for prospective relief; the remaining claims seeking a declaration that the official's prior conduct was in violation of federal law were characterized as retroactive relief which was barred by the Eleventh Amendment. The Sixth Circuit Court of Appeals affirmed. 106 S.Ct. at 425.

The Supreme Court upheld the dismissal of the requested retroactive relief on Eleventh Amendment grounds, reasoning as follows:

> "Both prospective and retrospective relief implicate Eleventh Amendment concerns, but the availability of prospective relief of the sort awarded in *Ex Parte Young* gives life to the Supremacy Clause. Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law. (Citation omitted). But compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment."

106 S.Ct. at 426.

The issue in the present case is whether an order invalidating the rate freeze imposed under § 2033(5) would be the type of

retroactive relief barred by the Eleventh Amendment as it was interpreted in *Edelman* and its progeny, or whether such relief would be designed to end a continuing violation of federal law as contemplated in *Green.* The present case admits of both possibilities. As the defendants pointed out, an order which would effectively require a capital allowance adjustment for the plaintiff's facilities dating back to the first quarter of 1983 would necessitate an expenditure of state funds to compensate the plaintiff for the much lower reimbursement rates it has been allotted since that time. On the other hand, both parties agree that the three-month freeze has had a continuing effect on the plaintiff's level of reimbursement. An order remedying a violation of federal law, which violation has continuing consequences, would be considered prospective relief. *Green,* 106 S.Ct. at 426.

The continuing effect of the three-month freeze is due to the provisions of the six-month formula and all other subsequent Methods of Implementation. Those subsequent methods predicate each provider's capital reimbursement rate on its capital allowance as of June 30, 1983. For example, the state Methods of Implementation for the period July 1, 1983 through June 30, 1984 provided that a facility's capital allowance as of June 30, 1983 governed capital reimbursement rates for the July 1, 1983 through June 30, 1984 period. (Berkopec Affidavit, ¶ 6). None of the Methods of Implementation in effect from June 30, 1983 through June 30, 1985 provided for any increase in capital allowances to reflect changes in ownership. (*Id.*). The Methods of Implementation for the period July 1, 1985 through June 30, 1986, provide for a

capital cost reimbursement based in large part on the capital allowance calculated under the 1983 Methods (*Id.,* ¶ 8). Therefore, the plaintiff has not received a capital allowance adjustment for any of the periods after June 30, 1983, because the changes of ownership of its facilities and the associated increased capital costs owing thereto were not recognized as of that date.[4]

██ Under these circumstances, the type of relief requested cannot be characterized as entirely retroactive. Whether the plaintiff should be allowed to recover a monetary award representing an increased capital allowance for any period after March, 1983, an award which would have to be considered retroactive, is a question the Court will address below. However, it is clear that an order invalidating § 2033(5) would have a prospective application in that it would provide for an upward adjustment of the plaintiff's capital allowance under the Methods of Implementation presently in effect. Accordingly, the nature of the relief requested does not bar this action by virtue of the Eleventh Amendment.

## B. Plaintiff's Claims Are Based on Federal Law, Not State Law.

The defendants contend that the plaintiff's claim of entitlement to a capital allowance adjustment relies on the premise that DHSS has erroneously applied the capital rescission or recoupment provision contained in the six-month formula, which reads as follows:

A rate increase(s) caused by a change in ownership of a facility during the July 1, 1982—December 31, 1982 time period—and recognized for purposes of a rate increase(s) six months after that date—

---

**4.** As discussed above, the plaintiff did not receive a capital allowance adjustment on March 1, 1983, when it first became entitled to one, due to the three-month rate freeze. No capital allowance adjustment was made in the period April 1, 1983 through June 30, 1983, because DHSS was analyzing what it considered to be the high purchase price of the plaintiff's new facilities in order to determine whether an alternative method of calculating the plaintiff's capital allowance should be used. Before this

analysis was completed, the Court's preliminary injunction was vacated. Due to the provision in the six-month formula allowing for the recoupment of rate increases paid in the wake of the Court's order, DHSS decided not to grant any adjustment in the plaintiff's capital allowance once this Court's preliminary injunction was vacated. Therefore, the plaintiff received no capital allowance adjustment as of June 30, 1983, and has not received one since. (Furkas Aff. ¶ 3–7).

may also be rescinded and/or recouped. Such an event would be triggered by legal developments in the above referenced litigation.

(Defendants' Brief In Opposition to Consolidated Motions for Preliminary Injunction and Summary Judgment, p. 4). The defendants further contend that the application of the six-month formula is a matter of state law which this Court cannot consider under the Eleventh Amendment as interpreted in *Pennhurst*.

The Court fails to discern the relevance of the recoupment provision as it pertains to the issue at hand. The plaintiff claims that its capital allowance was not adjusted due to the three-month freeze which was passed in violation of the Medicaid Act and its implementing regulations. The six-month formula and its recoupment provisions were enacted after this Court enjoined the defendants from imposing the freeze. Once the preliminary injunction was vacated, DHSS decided not to adjust the plaintiff's capital allowance (see footnote 4, *supra*). The plaintiff never received a capital allowance adjustment that was subject to recoupment. While the six-month formula and subsequent Methods of Implementation have had the effect of continuing the rate freeze as it applies to the plaintiff's capital allowance, the plaintiff's claim is that the original freeze is invalid, not the six-month formula and subsequent Methods which have made the freeze permanent.

At the time this action began, the Medicaid Act and its implementing regulations specified that "... the payment rates used by the [state] Medicaid agency must be determined in accordance with methods and standards developed by the agency." 42 U.S.C. § 1396a(a)(13); 42 C.F.R. § 447.-252(2). As such, the Medicaid Act explicitly incorporated the state standards which have been approved. *See Geis v. Board of Education of Parsippany-Troy Hills*, 774 F.2d 575, 581 (3d Cir.1985). Although the defendants argue that Congress never expressed any intention to abrogate the states' Eleventh Amendment immunity in connection with the Medicaid Act, *see Atascadero State Hospital v. Scanlon*, —— U.S. ——, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), the Court opines that the result advocated by the defendants would derogate those provisions of the Medicaid Act and its implementing regulations discussed heretofore. If it is difficult to perceive a congressional intent to abrogate the Eleventh Amendment in connection with the Medicaid Act, it is even more difficult to fathom a congressional intent that the requirements of federal law with respect to the Medicaid program not be enforceable in federal courts. *See Washington State Health Facilities*, 698 F.2d at 965, n. 4.

Disputes concerning changes in Medicaid reimbursement rates have been resolved in a number of cases brought in federal courts under federal question jurisdiction. *See, e.g., Nebraska Health Care Association, supra; Edgewater Nursing Center, supra; Washington State Health Facilities, supra*. The plaintiff has alleged violations of federal statutes as well as the United States Constitution; thus the jurisdiction of this Court has been properly invoked.

### C. Plaintiff's Request For Retroactive Damages Must Be Denied.

In *Daubert v. Percy*, 713 F.2d 328 (7th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1283, 79 L.Ed.2d 686 (1984), the Seventh Circuit stated that:

> "... not every award of retroactive monetary relief payable from a state treasury violates the Eleventh Amendment ... It is the disruptive effect a retroactive money award has upon a state's budget that distinguishes it from an injunction requiring an equal amount of prospective monetary relief." (citations omitted).

*Id.* at 329–30. The factual background of *Daubert* was summarized by this Court in its latest decision in *Reivitz*:

> *Daubert* concerned a situation where the district court issued a permanent injunction in 1973 against the Wisconsin Secretary of DHSS ordering him and his suc-

cessors in office to make certain welfare payments. Seven years later, in 1980, the district court amended the injunction so that the Secretary could refuse to make some of the payments required by the 1973 judgment. Plaintiffs then appealed that decision. However, while the appeal was pending, approximately five months after the district court amended the 1973 injunction the Wisconsin legislature amended the statute that underlay the original 1973 judgment, rendering that judgment unsound. On appeal, the Seventh Circuit reversed the district court's amendment of the 1973 injunction, but because of the change in the statute the original injunction was not reinstated.

On remand, the district court ordered the DHSS to pay the benefits that the State would have been required to pay during the five-month period between the time of the district court's amendment of the injunction and the legislative change in the statute underlying the original 1973 judgment. The DHSS challenged this ruling on appeal arguing that it violated the Eleventh Amendment. The Seventh Circuit affirmed the district court, finding as follows:

> The funds which defendants oppose paying are not compensation for loss prior to the entry of the 1973 injunction. They are funds which were required to be paid by that prospective injunction but were withheld because the injunction was erroneously modified in October 1980. Absent the erroneous modification and consistently with the Eleventh Amendment, defendants would have provided the benefits until the April 1, 1981, Wisconsin legislative change. The 1973 injunction was admittedly permissible under the Eleventh Amendment. That Amendment does not bar the [district court's] September 1982 order at issue because it was only effectuating the prior injunction during the brief period before the Wisconsin legislature acted.

713 F.2d at 330.

*Reivitz, supra,* at 1020–21.

The plaintiff argues that the holding in *Daubert* is directly applicable to this case. The plaintiff contends that this Court's March 22, 1983 injunction placed the state on notice that the three-month freeze was enacted in violation of federal law and that, in all likelihood, the state would be required to reimburse the plaintiff based on an increased capital allowance. The plaintiff further contends that the Seventh Circuit's decision vacating this Court's injunction should not have changed the state's expectations because, on remand, this Court was likely to adhere to its previous findings. Conversely, the defendants claim that the Supreme Court's decision in *Green v. Mansour, supra,* implicitly overrules *Daubert* by holding that the Eleventh Amendment prohibits all but prospective injunctive awards against a state.

In the latest *Reivitz* decision, this Court found, based on *Daubert,* that the Eleventh Amendment did not prohibit an award of retroactive monetary damages dating back to the time of the Court's order granting the plaintiff's motion for summary judgment. *Reivitz, supra,* at 1021. Therefore, the Court held that the defendants were liable for any damages owing to their illegal conduct for the period January 12, 1983, the day after the Court's order granting summary judgment, through June 30, 1983, the end of the period covered by the applicable state plan. Due to the particular facts of that case, however, the plaintiffs did not recover any monetary damages because the freeze affected a period preceding the Court's order and not thereafter. *Id.* Thus, the Court's decision to apply *Daubert* to the facts in *Reivitz* did not affect the outcome of that case.

█ A different situation exists in this case, however. A recalculation of the plaintiff's capital allowance as of the first quarter of 1983 would affect the rate at which the plaintiff has been reimbursed under all subsequent Methods of Implementation. Without knowing precisely what the difference is between the rate

paid to the plaintiff and the rate which would have been paid had the plaintiff's capital allowance been adjusted, it can be presumed that that difference is significant.

The key point, however, is that the state never determined with certainty what capital allowance adjustment the plaintiff was entitled to or under what formula the plaintiff's capital allowance adjustment would be calculated. Following the issuance of the preliminary injunction, DHSS solicited additional information from the plaintiff regarding its capital expenditures because the state agency considered those costs to be excessive (see footnote 4, *supra*). Unlike the situations in *Daubert*, where the state knew with certainty what its anticipated payments would be, and *Reivitz*, where the expected payments were fairly ascertainable and covered a limited time period, the state in this case had no firm basis upon which to gauge the additional reimbursement payments for which it might be held liable. Any award of monetary damages under these circumstances would far exceed the limited applicability of the *Daubert* rule and violate the tenor of the Eleventh Amendment as announced in *Green*, *Edelman* and *Pennhurst*.

## VII. STANDING

The defendants contend that the plaintiff lacks standing to prosecute this case because it is not a provider of services covered by Medicaid. According to the defendants, the only relationship the plaintiff has with the State of Wisconsin arises out of certain agreements it has with its subsidiary corporations through which the "provider" nursing homes are operated.

The question of standing "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). The constitutional aspect of the principle of standing involves "whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Id.* That

determination rests on whether the plaintiff has suffered "some threatened or actual injury resulting from the putatively illegal action." *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205, *quoting Linda R.S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). Among the "prudential limitations" which restrict a plaintiff's right to bring an action is the requirement that the plaintiff "assert his own legal rights and interests" and not those of a third party. *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205.

If nothing else, the discussion thus far should have demonstrated that the plaintiff has a sufficient connection with the State of Wisconsin and has itself suffered a monetary loss as a result of the defendants' violation of federal law so that it is entitled to bring this action. The plaintiff's connection with the state and the individual nursing homes it owns is readily apparent from the caption of this case, where the plaintiff is identified as "The Hillhaven Corporation, a Tennessee corporation, d/b/a Mt. Carmel Care Center, Antigo Community Care Center, Colonial Manor, Colonial Manor Nursing and Convalescent Home, Family Heritage/Black River Falls, Family Heritage/Manitowoc, Family Heritage/Neenah, Family Heritage/Schofield, Family Heritage/Wisconsin Rapids, Shorewood/Hillhaven Convalescent Center, Sheridan Nursing Home, Colony Oaks Care Center, Mt. Carmel Nursing Home and Woodstock/Kenosha Health Care." The defendants cite no authority for the proposition that the plaintiff lacks standing to bring this action simply because it operates the individual nursing homes through subsidiary corporations which are themselves separate legal entities. The critical fact is that the defendants' illegal actions have caused a substantial monetary harm to the plaintiff corporation itself. The Court perceives the defendants' argument as little more than an ill-disguised strategem designed to detract from the real issues at hand.

## VIII. CONCLUSION

For the foregoing reasons, the Court hereby Orders

(1) That the plaintiff's motion for summary judgment is GRANTED;

(2) that defendants Wisconsin Department of Health and Social Services, Linda Reivitz, in her official capacity as Secretary of the Wisconsin Department of Health and Social Services, Charles P. Smith, in his official capacity as Treasurer of the State of Wisconsin, and their officers, employees, sucessors and agents are enjoined from enforcing or continuing to apply the Medicaid rate freeze adopted as Section 2033(5), Chapter 317, Wisconsin Laws of 1981;

(3) that the defendants take all necessary and appropriate steps to ensure that the capital allowance component of nursing home reimbursement is computed under the approved Wisconsin State Medicaid Plan and is paid in compliance with all applicable requirements of federal law and the Wisconsin State Medicaid Plan; and

(4) that the defendants recompute the plaintiff's June 30, 1983 capital allowances for the facilities and facility leases acquired September 1, 1982 in accordance with the 1982 and January 1, 1983 through June 30, 1983 Wisconsin State Medicaid Plans and to use that recalculated allowance as the base rate in determining the plaintiff's current capital allowances.

In light of this decision, the Court need not consider the plaintiff's alternative request for a preliminary injunction.